AO 241
(Rev. 10/07)

## PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: **Eastern** |
|---|---|
| Name: **Trevor Johnson** | Docket or Case No.: **16-927** |
| Place of Confinement: **Louisiana State Penitentiary** | Prisoner No.: **384076** |
| Petitioner | Respondent |
| Trevor Johnson                    v. | N. Burl Cain, Warden **SECT. H MAG. 1** |
| The Attorney General of the State of Louisiana | |

### PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging: 22nd Judicial   District Court; Parish of St. Tammany, State of Louisiana.

    (b) Criminal docket or case number (if you know): 470776

2.  (a) Date of the judgment of conviction (if you know): September 12, 2011

    (b) Date of sentencing:

3.  Length of sentence: Life without the benefit of Probation, Parole, or Suspension of Sentence.

4.  In this case, were you convicted on more than one count or more than one crime?  ☐ Yes  X  No

5.  Identify all crimes of which you were convicted and sentenced in this case: Aggravated Rape.

6.  What was your plea? (Check one)

    X  (1)  Not guilty          ☐  (3)  Nolo contendere (no contest)

    ☐  (2)  Guilty              ☐  (4)  Insanity Plea

    (b)     If you entered a guilty plea to one count or indictment, and a not guilty plea to another count what did you plead guilty to and what did you plead not guilty to?

    (c) If you went to trial, what kind of trial did you have? (Check one)

    X  Jury     ☐  Judge only

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?
    ☐  Yes     ☐  No

8.  Did you appeal from the judgment of conviction?
    X  Yes     ☐  No

X Fee _____
Process_____
X Dktd_____
CtRmDep_____
Doc. No._____

\\Mepd05\ICS\Lp-dconstance80\My Documents\clients\Johnson\Johnson T. #384076\Johnson Trevor New.2254.odt

AO 241                                                                                    Page 2
(Rev. 10/07)

9.      If you did appeal, answer the following:

        (a) Name of court: Louisiana Court of Appeals

        (b) Docket or case number (if you know): 2011-KA-2240

        (c) Result: Affirmed

        (d) Date of result: June 8, 2012

        (e) Citation to the case (if you know):

        (f) Grounds raised: (1) Excessive Sentence; (2) Insufficient Evidence; (3) Failure to Suppress the "Partially
        Inaudible" telephone call; (4) Batson violation during jury selection.

        (g) Did you seek further review by a higher state court?  X  Yes        ☐  No

                If yes, answer the following:

                (1) Name of court: Louisiana Supreme Court.

                (2) Docket or case number (if you know): 2012-KO-1597

                (3) Results: Denied

                (4) Date of result (if you know): January 25, 2013

                (5) Citation to the case (if you know): 105 So.3d 711

                (6) Grounds raised: Same as Appeal

        (h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes  X   No

                If yes, answer the following:

                (1) Docket or case number (if you know):

                (2) Result:

                (3) Date of result (if you know):

                (4) Citation to the case (if you know):

10.     Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions
concerning this judgment of conviction in any state court?  X  Yes        ☐  No

11.     If your answer to Question 10 was "Yes", give the following information:

        (a)     (1) Name of court: 22nd Judicial District Court; Parish of St. Tammany, State of Louisiana.

                (2) Docket or case number (if you know): 470,776

                (3) Date of filing (if you know):

                (4) Nature of the proceeding: Application for Post-Conviction Relief

                (5) Grounds raised: (1)Conviction obtained in violation of Telecommunications Act; (2) trial court
                abused its discretion with the denial of Motion for New Trial; (3) life sentence with non-
                unanimous verdict; (4) use of expert witness from a non-existent field.

AO 241                                                                                    Page 3
(Rev. 10/07)

(6) Did you receive a hearing where evidence was given on your petition, application or motion?

□   Yes  X   No

(7) Result: <u>Denied</u>

(8) Date of result (if you know): <u>February 10, 2014. However, Mr. Johnson was not notified until</u>

<u>September 11, 2014. After numerous attempts Mr. Johnson was finally able to obtain a written Ruling from the</u>

<u>district court.</u>

(b) If you filed any second petition, application or motion give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application or motion?
□   Yes □   No

(7) Result:

(8) Date of result (if you know):

(c) If you filed any third petition, application or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application or motion?
□   Yes □   No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction the result of action taken on your petition, application or motion?

(1) First petition:           X   Yes         □   No

(2) Second petition:        □   Yes         □   No

(3) Third petition:          □   Yes         □   No

(e) If you did not appeal to the highest state court having jurisdiction, explain briefly why you did not:

AO 241                                                                                           Page 4
(Rev. 10/07)

12.     For this petition, state every ground which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

        CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust (use up) your available state court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Whether the trial court abused its discretion in sentencing defendant to life sentence, since the crime alleged to have been committed in this case would have been prosecuted as an Aggravated Incest which carries a lower exposure than an Aggravated Rape, making the imposition of a life sentence in the case arbitrary and constitutionally excessive.

GROUND TWO: Whether the State failed to prove beyond a reasonable doubt, every essential element of the offense that Mr. Johnson had committed Aggravated Rape of CE

GROUND THREE: Whether the trial court erred in the denial of defense counsel's Motion to Suppress the introduction of the partially inaudible telephone call into evidence, and whether Mr. Johnson's conviction was obtained in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution; as the telephone call submitted to the jury was in violation of the Telecommunications Act.

GROUND FOUR: Whether the trial court erred in allowing the State to strike two African-American prospective jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

GROUND FIVE: Whether the Court abused its discretion by denying the Motion for New Trial.

GROUND SIX: Whether the trial court abused its discretion by accepting the non-unanimous verdict of guilty by the jury.

GROUND SEVEN: Whether the Court abused its discretion with the acceptance of the expert witness testimony.


(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): See: Memorandum in Support.

(b) If you did not exhaust your state remedies on Ground One, explain why

(c)     Direct Appeal of Ground One: See: Memorandum in Support.


        (1)     If you appealed from the judgment of conviction, did you raise this issue? X  Yes  □  No

        (2)     If you did not raise this issue in your direct appeal, explain why:

(d) Post Conviction Proceedings

        (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        X  Yes  □   No

        (2)     If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Application for Post-Conviction Relief w/ Memorandum in Support

Name and location of the court where the motion or petition was filed: 22nd Judicial District Court, Parish of St. Tammany, State of Louisiana.

Docket or case number (if you know): 470,776

Date of court's decision: February 10, 2014. Mr. Johnson was unable to obtain a Ruling until the month of October, 2014, after numerous requests and filings into the district court.

Result (attach a copy of the court's opinion or order, if available): Denied

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  X  No

(4) Did you appeal from the denial of your motion or petition?  X  Yes  ☐  No

(5) If you answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  X  Yes  ☐  No

(6) If your answer to Question (d)(4) is "Yes," state: Supervisory Writ

Name and location of the court where the motion or petition was filed: Louisiana First Circuit Court of Appeals, and Louisiana Supreme Court

Docket or case number (if you know):

Date of court's decision: May 4, 2015 (1st C.O.A.), January 8, 2016 (Louisiana Supreme Court).

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

## GROUND TWO:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim):

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☐ Yes          ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)     **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes          ☐ No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                     □  Yes              □  No

(4) Did you appeal from the denial of your motion or petition?                □  Yes              □  No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal?    □  Yes  □  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)        Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two:

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): <u>See Memorandum in Support</u>

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)        Direct Appeal of Ground Three: <u>See Memorandum in Support</u>.

          (1) If you appealed from the judgment of conviction, did you raise this issue?         □  Yes              □  No

          (2) If you did not raise this issue in your direct appeal, explain why:

(d)        Post Conviction Proceedings: <u>See Memorandum in Support</u>.

          (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

AO 241                                                                                              Page 7
(Rev. 10/07)

☐ Yes        ☐ No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                    ☐ Yes        ☐ No

(4) Did you appeal from the denial of your motion or petition?               ☐ Yes        ☐ No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)        **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c)        **Direct Appeal of Ground Four: See Memorandum in Support.**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes        ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post Conviction Proceedings: See Memorandum in Support.**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes        ☐ No

\\Mepd05\ICS\Lp-dconstance80\My Documents\clients\Johnson\Johnson T. #384076\Johnson Trevor New.2254.odt

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                    ☐ Yes          ☐ No

(4) Did you appeal from the denial of your motion or petition?               ☐ Yes          ☐ No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:


(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:


13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☐ Yes  ☐ No

        If you answer is "No," state which grounds have not been do presented and give your reason(s) for not presenting them:


(b)     Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them:


14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?          ☐ Yes          ☐ No

        If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy or any court opinion or order, if available.

AO 241                                                                                           Page 9
(Rev. 10/07)

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
       the judgment you are challenging?          ☐ Yes          ☐ No
       If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the
       issues raised.

(16)   Give the name and address, if you know, of each attorney who represented you in the following stages of the
       judgment you are challenging:

       (a) At preliminary hearing: Roy K. Burns, Jr.; 404 E. Gibson St., Covington, LA 70433.


       (b) At arraignment and plea: Roy K. Burns, Jr.; 404 E. Gibson St., Covington, LA 70433.


       (c) At trial: Roy K. Burns, Jr.; 404 E. Gibson St., Covington, LA 70433.


       (d) At sentencing: Roy K. Burns, Jr.; 404 E. Gibson St., Covington, LA 70433.


       (e) On appeal: Mary E. Roper; Louisiana Appellate Project; 830 Main St., Baton Rouge, LA 70802


       (f) In any post-conviction proceeding: Pro-Se


       (g) On appeal from any ruling against you in a post-conviction proceeding:


17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are
       challenging?  ☐ Yes   X No
       (a) If so, give the name and location of the court that imposed the other sentence you will serve in the future:
       (b) Give the date the other sentence was imposed:
       (c) Give the length of the other sentence:
       (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the
       future?  ☐ Yes          ☐ No


18.    TIMELINESS OF PETITION: If you judgment of conviction became final over one year ago, you must explain
       the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.[1]

─────────────────────────

1    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244 (d)
provides in part that:

         (1) A one year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody
pursuant to the judgment of a State court. The limitation period shall run from the latest of –

                 (A) the date on which the judgment became final by the conclusion of direct review or the expiration of
the time for seeking for such review;

AO 241
(Rev. 10/07)

Therefore, petitioner asks that the Court grant the following relief: After careful review of the evidence and testimony presented in this case, make the determination that the State failed to meet its burden of proof for a finding of guilt; or, in the alternative, find that Mr. Johnson was denied his Due Process rights to a fair and impartial trial; or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on February 1, 2016 (month, day, year).

Executed (signed) on February 1, 2016 (date)

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

---

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could not have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Trevor Johnson, #384076
MPWY/Oak-2
Louisiana State Penitentiary
Angola, LA 70712

February 1, 2016
(Date)

Clerk of Court,
U.S. District Court,
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130

RE: *Trevor Johnson v. N. Burl Cain, Warden*, Civil No. _____.

Dear Clerk:

Please find enclosed an Original of my pro se *Petition for Federal Habeas Corpus (28 U.S. C. § 2254)* and accompanying *Memorandum of Law in Support* in the above referenced civil matter. I respectfully ask that you please file same into the docket of this court for judicial consideration and disposition.

Your cooperation and time in this matter are greatly appreciated.

Respectfully,

Trevor Johnson

TJ/dec#304580

Enclosures (2)

Cc:    w/encl. District Attorney, St. Tammany Parish

### IN THE
### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**TREVOR JOHNSON**

**Vs. No.: _____**

**N. BURL CAIN, WARDEN**

On Petition for Federal Habeas Corpus (28 U.S.C. § 2254) from the 22ND Judicial District Court, Parish of St. Tammany, State of Louisiana.

Respectfully submitted this 1st day of February, 2016.

TREVOR JOHNSON, #384076
MPWY/OAK-2
LA. STATE PENITENTIARY
ANGOLA, LA 70712

**CIVIL PROCEEDINGS**

*PREPARED BY*
David Constance #304580 Offender Counsel Substitute III
Main Prison Legal Aid Office
Cell Block Litigation Team
La. State Penitentiary
Angola, LA 70712

## TABLE OF CONTENTS:

TABLE OF AUTHORITIES...................................................................................................3

MEMORANDUM OF LAW IN SUPPORT....................................................................1

NOTICE OF PRO-SE FILING.........................................................................................1

PROCEDURAL HISTORY................................................................................................1

STANDARD OF REVIEW................................................................................................3

TIMELINESS OF PETITION............................................................................................3

STATEMENT OF THE FACTS........................................................................................4

FEDERAL QUESTIONS PRESENTED.........................................................................5

ISSUES FOR RELIEF.......................................................................................................6

ARGUMENT(S)..................................................................................................................7

ISSUE NO. 1.......................................................................................................................7

    **Whether the trial court abused its discretion in sentencing defendant to life sentence, since the crime alleged to have been committed in this case would have been prosecuted as an Aggravated Incest which carries a much lower penalty exposure than an Aggravated Rape, making the imposition of a life sentence in the case arbitrary and constitutionally excessive**.................................................7

ISSUE NO. 2.....................................................................................................................12

    **Whether The State failed to prove beyond a reasonable doubt, every essential element of the offense that Mr. Johnson had committed Aggravated Rape of CF**.....12

ISSUE NO. 3.....................................................................................................................22

    **Whether the trial court erred in the denial of defense counsel's motion to suppress the introduction of the partially inaudible telephone call into evidence; and Whether Mr. Johnson's conviction was obtained in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution; as the telephone call submitted to the jury was in violation of the Telecommunication Act**.......................22

ISSUE NO. 4.....................................................................................................................36

    **Whether the trial court erred in allowing the state to strike two African-American prospective jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)**.......................................................................................................36

ISSUE NO. 5.....................................................................................................................42

    **Whether the Court abused its discretion by denying the Motion for New Trial**.........42

ISSUE NO. 6............................................................................................43

    **Whether the trial court abused its discretion by accepting the non-unanimous verdict of guilt by the jury**..............................................................43

DISCRIMINATORY INTENT.................................................................45

DISCRIMINATORY EFFECT..................................................................50

ISSUE NO. 7............................................................................................52

    **Whether the Court abused its discretion with the acceptance of the expert witness testimony**..........................................................................52

EXPERT TESTIMONY............................................................................55

    **Federal Constitution Violation**......................................................61

    **Effect**..........................................................................................61

CONCLUSION.........................................................................................62

CERTIFICATE OF SERVICE.................................................................62

## TABLE OF AUTHORITIES:

## U.S. CONSTITUTION:

Eighth Amendment to the United States Constitution...................................................................61
Fifth Amendment to the United States Constitution.............................................................12, 29, 48
Fifth and Fourteenth Amendment to the United States Constitution...........................................21
First Amendment of the United States Constitution.......................................................................32
First and Fourth Amendments of the United States Constitution..................................................33
Fourteenth Amendment to the United States Constitution..5, 6, 12, 13, 21, 24, 36-38, 43-4, 47, 51
Fourth Amendment of the United States Constitution...............................................................32, 33
Fourth and Fifth Amendments of the Constitution.........................................................................29
Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.................61
Sixth Amendment to the United States Constitution................................................................37, 44

## FEDERAL CASES:

Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50
L.Ed.2d 450 (1977)..........................................................................................................................44
Artuz v. Bennett, 121 S.Ct. 361, 531 U.S. 4 (2000)..........................................................................4
Babb v. Eagleton, N.D.Okla. 2007, 616 F.Supp.2d 1195..................................................................35
Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)..........................6, 36, 38
Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).......................................21
Carey v. Saffold, 122 S.Ct. 2134, 536 U.S. 214 (2002)......................................................................4
Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2D 705 (1967)..............................15
Daubert v. Dow Pharmaceuticals, 509 U.S. 579 (1993)...................................................................58
Dupuy v. Cain, 210 F.3d 582 (5th Cir. 2000)....................................................................................14
Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)..............................................1
Haynes v. Quarterman, 561 F3d 535 (5th Cir. 2009)......................................................................38
Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 1866 (1991)..............................................37
Holloway v. McElroy, 632 F.2d 605, 639 (5th Cir. 1980)................................................................12
Homan v. United States, 279 F.2d 767, 772 (8th Cir.).....................................................................59
Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985)...........................44
In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L. Ed. 2D 368 (1970)...................................12, 13
Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 60 (1979)..............................12, 13
Johnson v. California, 545 U.S. 162, 170, 125 S.Ct. 2410 (2005)...................................................39
Johnson v. Louisiana, 406 U.S. 366, 397 S.Ct. 1620, 32 L.Ed.2d 152 (1972).............................51
Kuhlmann v. Wilson, 106 S.Ct. 2616 (1986)....................................................................................14
Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).....44
Murray v. Carrier, 106 S.Ct. 2639 (1986)........................................................................................14
Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939)..........................29
Price v. Cain, 560 F.3d 284 (5th Cir. 2009).....................................................................................39
Sawyer v. Whitley, 112 S.Ct. 2514 (1992).......................................................................................14
Schlup v. Delo, 115 S.Ct. 851 (1995)...............................................................................................14

Strauder v. West Virginia, 100 U.S. 303 (1880)................................................47
Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)..................37
Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)................37
U.S. v. Bently-Smith, 2 F.3d 1368, 1373 (5th Cir. 1993)...................................38
U.S. v. Fallon, 112 F.2d 894 (2nd Cir. 1940)................................................30
U.S. v. Karo, 468 U.S. 705 (1984)..........................................................32
U.S. v. Polakoff, 112 F.2d 888 (2nd Cir. 1940)..............................................29
U.S. v. U.S. District Court, 407 U.S. 297 (1972)............................................32
United States v. Azure, 801 F.2d 336 (8th Cir. 1986).......................................58
Ward v. Cain, 53 F.3d 106 (5th Cir. 1995)..................................................14
Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).........45
Williams v. Taylor, 120 S.Ct. 1495, 529 U.S. 362 (2000).....................................3
Yarborough v. Alvarado, 124 S.Ct. 2140, 541 U.S. 652 (2004)................................3

## STATUTORY PROVISIONS:

18 U.S.C.A. § 2510 et seq...................................................................34
28 U.S.C. § 2244(d)(1).......................................................................4
28 U.S.C. § 2244(d)(2).......................................................................4
28 U.S.C. § 2254(d)(2).......................................................................3
28 USC § 2254...............................................................................1
Art. 508 of the 1928 Code..................................................................43
Article 15 of the Louisiana Code of Criminal Procedure..................................24, 34
Code of Criminal Procedure Article 875.....................................................10
La C Art. VI (1868).........................................................................46
La.C.Cr.P. Art. 782.........................................................................44
La.C.Cr.P. Art. 851.........................................................................43
La.C.Cr.P. Art. 930.1........................................................................3
La.Ch.C. Art. 728...........................................................................26
Louisiana Code of Criminal Procedure Article 894.1.........................................10
Louisiana Constitution of 1974, Art. I, § 16 (1974)........................................15
LSA-29:20...................................................................................26
LSA-C.E. 403................................................................................56
LSA-C.E. Art. 412...........................................................................53
LSA-C.E. Art. 607 (C).......................................................................53
LSA-C.E. Art. 702...........................................................................56
LSA-C.E. Rule 609.1(C)......................................................................54
LSA-R.S. 14:78.1.............................................................................7
LSA-R.S. 14:93.2.2..........................................................................26
LSA-R.S. 15:1303............................................................................34
LSA-R.S. 15:1307.......................................................................24, 28, 34
LSA-R.S. 15:1308.......................................................................22, 27, 31
LSA-R.S. 15:1310.......................................................................23, 27, 33
LSA-R.S. 15:495.............................................................................54

LSA-R.S. 37:3390.4.......................................................................................26
LSA-R.S. 93.2...............................................................................................25

## LA CONSTITUTION:

Article I, § 15, of the Louisiana Constitution......................................21
Article I, Section Three (3) of the Louisiana Constitution of 1974..........44, 51
Louisiana Constitution of 1974, Art. I § 17 (A)..........................44, 45
Louisiana Constitution of 1974, Art. I, § 20..............................8

## STATE CASES:

Commonwealth v. Seese, 512 Pa. 439,517 A.2d 920, 922 (Pa. 1986)................58
State ex rel Nicholas v. State of Louisiana, 520 So.2d 377(La. 1988)..........15
State v Davis, 498 So 2d 723 (La. 1986)..............15
State v. Alexander, 42,957 (La. App. 2nd Cir. 2/13/08), 976 So.2d 287.........10
State v. Bailey, 41,432 (La. App. 2nd Cir. 9/20/06), 940 So.2d 95 .........11
State v. Bertrand, 6 So.3d 38 (La. 3/17/09)...........44
State v. Boden, 04-1000 (La. App. 5th Cir. 3/1/05), 901 So.2d 445..........11
State v. Bonanno, 384 So.2d 355 (La. 1980)...........9
State v. Brossette, 599 So.2d 1092 (La. 1992).........56
State v. Cantanese, 368 So.2d 975 (La. 1979)..........56
State v. Collier, 553 So.2d 815, 820 (La. 1989.........37
State v. Connor, 403 So.2d 678, 680 (La. 1981).........55
State v. D.M., 42,038 (La. App. 2nd Cir. 5/9/07), 958 So.2d 77..........11
State v. Davis, 498 So.2d 723 (La. 1986)...........15
State v. Dorthey, 623 So.2d 1276 (La. 1993)..........8
State v. Everidge, 96-2647 (La. 12/2/97), 702 So.2d 680...........53
State v. Foret, 620 So.2d 821 (La. 1993)...........55
State v. Gibson, 391 So. 2d 421 (La. 1980)..........15, 60
State v. Gilliam, 36,118 (La. App. 2nd Cir. 8/30/02), 827 So.2d 508.........14
State v. Hotoph, 99-243 (La. App. 5th Cir. 11/10/99), 750 So.2d 1036.........11
State v. J.T.S., 2003-1059 (La. App. 3rd Cir. 2/4/04), 865 So.2d 1032..........11
State v. Jackson, 307 So.2d 604, 608 (La. 1975)...........54
State v. Jones, 610 So.2d 782 (La. 1992), 91-KH-1101...........13
State v. Lockwood, 439 So.2d 394 (La. 1983)...........9
State v. Oliver, 387 So.2d 1154, 1156 (La. 1980)...........54
State v. Pollard, 93-0660 (La. 10/20/94), 644 So.2d 370...........9
State v. Prince, 32,134 (La. App. 2nd Cir. 6/16/99), 742 So.2d 922...........11
State v. Quebedeaux, 424 So.2d 1009 (La. 1982)...........9
State v. Rimmash, 775 P.2d 388, 398 (Utah 1989)...........57
State v. Sepulvado, 367 So.2d 762 (La. 1979)...........8
State v. Smith, 2001-2574 (La. 1/14/03), 839 So.2d 1 (La. 2003)...........9
State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442...........14

State v. Smith, 98-2045 (La. 1/8/99), 734 So.2d 646......................................................53
State v. Walters, 523 So.2d 811 (La. 1988)...................................................................60
State v. Watson, 32,203 (La. App. 2nd Cir. 8/18/99), 743 So.2d 239.............................11
State v. Williams, 423 So.2d 1048 (La. 1982)..................................................................22

## OTHER:

Abbe, Ronald M. "That the Reign of Robbery Will Never Return to Louisiana"..........................46
Act of 1805, § 3 3.................................................................................................46
In Search of Fundamental Law, (1993).............................................................46, 47
Lanza, Michael L. "Little More than a Family Matter: The Constitution of 1898."....................47
Section 605 of the Federal Communications Act.................................................................29
Vincent, Charles M. "Black Constitutional Makers: The Constitution of 1868...........................46
Voorhies A.A. Treatise on the Criminal Jurisprudence of Louisiana, Bloomfield & Steel (1860)46

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TREVOR JOHNSON

-Versus-

N. BURL CAIN, Warden

CIVIL ACTION

NUMBER:

JUDGE:

MAGISTRATE:

## MEMORANDUM OF LAW IN SUPPORT
## OF PETITION FOR FEDERAL HABEAS CORPUS

**MAY IT PLEASE THE COURT:**

NOW INTO COURT comes Trevor Johnson, *Pro Se* Petitioner, who respectfully presents his *Memorandum of Law in Support of Petition for Federal Habeas Corpus*, and who respectfully prays this Honorable Court will accept and consider same in concert with his *Petition for Federal Habeas Corpus* pursuant to *28 USC § 2254*.

### NOTICE OF PRO-SE FILING

Mr. Johnson requests that this Honorable Court view these Claims in accordance with the rulings of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Mr. Johnson is a layman of the law and untrained in the ways of filings and proceedings of formal pleadings in this Court.

### PROCEDURAL HISTORY

The trial court presided over Mr. Johnson's motion to suppress his statements and denied the motion. Thereafter, the trial court presided over Mr. Johnson's trial and accepted the verdict returned by the jury. Subsequently, the trial court denied Mr. Johnson's post-trial motions for a new trial and for post-verdict judgment of acquittal and sentenced him to life in prison without the benefit of Probation,

Parole or Suspension of sentence. Following sentencing, the trial court denied Mr. Johnson's motion for reconsideration of sentence.

Louisiana Appellate Project attorney, Mary E. Roper timely filed the Original Brief of appeal in the First Circuit Court of Appeal, followed by a timely filed pro-se Supplement filed by Mr. Johnson. However, the First Circuit Court of Appeal denied relief on June 8, 2012.

Mr. Johnson then filed his Writ of Certiorari to the Louisiana Supreme Court on July 3, 2012, which was denied on Jan. 25, 2013 in docket no. 2012-KO-1597, 105 So.3d 711, (La. 1/25/13).

Mr. Johnson then filed his Writ of Certiorari to the Louisiana Supreme Court on July 3, 2012, which was denied on Jan. 25, 2013 in docket no. 2012-KO-1597, 105 So.3d 711, (La. 1/25/13).

On January 10, 2013, Mr. Johnson filed his Application for Post-Conviction Relief into the 22nd Judicial District Court. On February 11, 2014, Mr. Johnson received the State's Answer. On February 18, 2014, Mr. Johnson filed Traverse to the State's Answer to the Application. the **ONLY** notification of **ANY** Ruling was when the district court denied his Motion for Evidentiary Hearing and Appointment of Counsel and Petition for Habeas Corpus Ad Testificandum had been denied on February 12, 2014. The denials of these aforementioned motion are the **ONLY** Rulings which Mr. Johnson has received from the 22nd Judicial District Court.

On June 23, 2014, Mr. Johnson filed for a Status Check to the Clerk of Court in and for the parish of St. Tammany, 22nd Judicial District Court. After no response, Mr. Johnson then filed a second Status Check to the Clerk of Court's Office on September 4, 2014. The Clerk's response to this Status Check simply stated, "In response to your letter dated 9-4-14, the Post-Conviction Petition was denied on 2-10-14, subsequent pleading to traverse is moot, per Judge Richard A. Swartz on this 11th day of September, 2014."

On September 22, 2014, Mr. Johnson filed into the 22nd Judicial District Court, Motion for

Clarification and Written Ruling Pursuant to La.C.Cr.P. Art. 930.1, Notice of Intent to Seek Writs, and Motion Requesting Extension of Time.

On October 17, 2014, Mr. Johnson filed his Application for Supervisory Writ into this Honorable Court. On January 12, 2015, the First Circuit Court of Appeals, "Writ denied on the showing made in part and Writ denied in part" (See: Reasons on Ruling).

At the time of this filing, Mr. Johnson is resubmitting his Application for Supervisory Writs to the First Circuit Court of Appeals simultaneously. Mr. Johnson respectfully requests that this Honorable Court place this matter in "Stay and Abeyance" until the time that the Court of Appeals rules on the resubmitted Writ.

On January 8, 2016, Mr. Johnson was denied by the Louisiana Supreme Court in *State ex rel. Trevor Johnson v. State of Louisiana,* docket number 2015-KH-0267 (La. 1/8/16)(per curiam).

### STANDARD OF REVIEW

A petition for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *28 U.S.C. § 2254(d)(2). Williams v. Taylor,* 120 S.Ct. 1495, 529 U.S. 362 (2000); *Yarborough v. Alvarado,* 124 S.Ct. 2140, 541 U.S. 652 (2004).

### TIMELINESS OF PETITION

A 1-year period of limitation shall apply to an petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of (A)

the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by state action in violation of the Constitution of laws of the United States is removed, if the applicant was prevented from filing by such state action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. *28 U.S.C. § 2244(d)(1)*. The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection. *28 U.S.C. § 2244(d)(2)*. *Artuz v. Bennett*, 121 S.Ct. 361, 531 U.S. 4 (2000); *Carey v. Saffold*, 122 S.Ct. 2134, 536 U.S. 214 (2002).

## STATEMENT OF THE FACTS

Sometime in November of 2008, CF, D.O.B. 1/26/96, was referred to a social worker by her Aunt for counseling when she began acting out in school and having behavioral problems, including being disrespectful to her mother (Rec. Vol. III, p. 406). After about a month and a half of counseling, CF reported that she was being sexually abused by her stepfather, Trevor T. Johnson, defendant herein (Rec. Vol. III, pp. 407, 408). She indicated that it had happened about three to five times and included oral and vaginal sex (Rec. Vol. III, pp. 418, 421).

The social worker informed CF that she was going to have to report this to the Office of Children's Services and to the police (Rec. Vol. III, p. 407). When CF was initially brought to the Children's Advocacy Center by her mother for an interview, CF recanted her story (Rec. Vol. III, p. 435). After being interviewed by the Advocacy Center a second time a few month later, she reverted to her original

story.

At trial, CF testified that the first incident of sexual abuse occurred when she was around nine years old, at which point Mr. Johnson touched her vagina (Rec. Vol. III, p. 464). She claimed that the next time anything occurred, Mr. Johnson put his penis in her "butt" (Rec. Vol. III, p. 466). CF testified that on the following occasion that Mr. Johnson had vaginal sex with her (Rec. Vol. III, p. 467). Finally, the last incident that CF testified to was that Mr. Johnson had gotten on top of her and began sucking her breasts (Rec. Vol. III, p. 469). CF said that she told her mother but her mother did not do anything and that after she had revealed this information to the counselor that her mother had asked her to recant her story (Rec. Vol. III, p. 469). At trial, CF denied that she had engaged in oral sex with Mr. Johnson (Rec. Vol. III, p. 476).

CF was sent for an examination by a pediatrician who specializes in child abuse (Rec. Vol. III, p. 505). The pediatrician testified that CF had a normal exam and that she only reported but one incident of sex, which included both vaginal and anal sex (although she also denied anything happening to her bottom or anything touching her bottom)(Rec. Vol. III, pp. 556-558). CF denied having oral sex (Rec. Vol. III, p. 556).

Mr. Johnson adamantly denied having abused his stepdaughter in any way (Rec. Vol. IV, pp. 595-596). CF's mother, Aunt and maternal grandparents also testified in Mr. Johnson's defense expressing disbelief in CF's story and testifying that they never saw anything inappropriate with Mr. Johnson's behavior toward or in his relationship with his stepdaughter (Rec. Vol. IV, pp. 623-691).

## FEDERAL QUESTIONS PRESENTED

1. **Did the state courts abuse their discretion when the conviction was obtained with insufficient evidence, which is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States?** *Jackson v. Virginia*; **Sixth and Fourteenth Amendments to the United States Constitution. Mr. Johnson answers: Yes.**

2. Was Mr. Johnson denied a constitutionally fair and impartial decision by the state court's denial of relief concerning the abuse of discretion concerning the *Batson* Challenge which resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Fourteenth Amendment to the United States Constitution. Mr. Johnson answers: Yes.

3. Was Mr. Johnson subjected to a harsher sentencing range due to the abuse of discretion by the state court in overcharging him, which is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States? Sixth and Fourteenth Amendments to the United States Constitution. Mr. Johnson answers: Yes.

4. Was Mr. Johnson denied Due Process with the state allowing a non-unanimous verdict? And, did the rulings from the state court result in a decision that was based on an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States? Sixth and Fourteenth Amendments to the United States Constitution. Mr. Johnson answers: Yes.

## ISSUES FOR RELIEF

1. Whether the trial court abused its discretion in sentencing defendant to life sentence, since the crime alleged to have been committed in this case would have been prosecuted as an Aggravated Incest which carries a much lower penalty exposure than an Aggravated Rape, making the imposition of a life sentence in the case arbitrary and constitutionally excessive.

2. Whether The State failed to prove beyond a reasonable doubt, every essential element of the offense that Mr. Johnson had committed Aggravated Rape of CF.

3. Whether the trial court erred in the denial of defense counsel's motion to suppress the introduction of the partially inaudible telephone call into evidence; and Whether Mr. Johnson's conviction was obtained in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution; as the telephone call submitted to the jury was in violation of the Telecommunication Act.

4. Whether the trial court erred in allowing the state to strike two African-American prospective jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

5. Whether the Court abused its discretion by denying the Motion for New Trial.

6. Whether the trial court abused its discretion by accepting the non-unanimous verdict of guilt by the jury.

7. Whether the Court abused its discretion with the acceptance of the expert witness testimony.

# ARGUMENT(S)

## ISSUE NO. 1

**Whether the trial court abused its discretion in sentencing defendant to life sentence, since the crime alleged to have been committed in this case would have been prosecuted as an Aggravated Incest which carries a much lower penalty exposure than an Aggravated Rape, making the imposition of a life sentence in the case arbitrary and constitutionally excessive.**

Trevor Johnson was exposed to a mandatory life sentence due to this conviction. Had he been charged with Aggravated Incest (LSA-R.S. 14:78.1) instead of Aggravated Rape, he would have only been exposed to a minimum of twenty-five (25) years without the benefit of Probation, Parole or Suspension of sentence, and a maximum of ninety-nine (99) years.

The facts presented by the State in support of the conviction in this case were the Mr. Johnson engaged in one instance of anal sexual intercourse and one instance of vaginal sexual intercourse with his stepdaughter before she was thirteen years of age. Aggravated Incest is defined, in pertinent part:

"... the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece."

One of the acts prohibited in Subsection B is sexual intercourse.

Aggravated Rape is defined, in pertinent part, as:

"... a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because" ... "the victim is under the age of thirteen years."

Thus, the elements of Aggravated Incest and the elements of Aggravated Rape were both implicated by the facts presented by this case. The choice to prosecute Mr. Johnson for Aggravated Rape instead of Aggravated Incest, caused him to be subject to a mandatory life sentence. The statutory scheme of having two statutes which cover an identical set of facts, essentially leaves the sentencing up to the whim of the prosecutor, by allowing the State to choose which statute it shall proceed under, and

accordingly, which penalty the defendant shall be subject to in the event of a conviction.

This redundancy in statutory definitions with vastly different penalty exposure makes the imposition of a mandatory life sentence under the set of facts presented by this case arbitrary and unconstitutional. Defendants who are similarly situated are not being treated the same. There are no guidelines in place to instruct the prosecution as to which cases of sexual intercourse with a prohibited family member who is under the age of thirteen are to be prosecuted as Aggravated Rapes and which ones are to be prosecuted as Aggravated Incests. The prosecution is being allowed unfettered discretion in how to prosecute these cases. It leaves open the opportunity for favorable treatment by prosecutors for affluent offenders and harsh treatment of the indigent (who are disproportionately represented by minorities).

At the time of sentencing, Mr. Johnson, an African-American male, was determined to be thirty-four years of age. His testimony at trial revealed that he had a prior history of convictions for marijuana and cocaine possession as a juvenile, a prior DWI, a theft conviction and a conviction for possession of an illegal firearm (Rec. Vol. III, p. 579). Immediately after sentencing, the defense moved for reconsideration of Mr. Johnson's under the legal instruction of *State v. Dorthey*, 623 So.2d 1276 (La. 1993), which allows a court to sentence an offender to a sentence of less severity than the mandatory minimum if such is warranted. The defense implored the court to sentence Mr. Johnson to twenty-five (25) years. However, this motion was summarily denied (Rec. Vol. IV, pp. 780-781).

The Louisiana Constitution of 1974, Art. I, § 20 provides that no law shall subject any person to excessive punishment. In upholding this mandate, the Louisiana Supreme Court has decreed that although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La. 1979). In giving guidance to a review of excessiveness, the Louisiana Supreme Court has explained that when a sentence imposed punishment which is grossly

disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering, it is unconstitutionally excessive. *State v. Bonanno*, 384 So.2d 355 (La. 1980); *State v. Smith*, 2001-2574 (La. 1/14/03), 839 So.2d 1 (La. 2003).

Sentences are supposed to be tailored to the particular circumstances of the offense and of the offender standing before the court. For that reason, trial courts have the authority to reduce a mandatory minimum sentence if the sentence would be constitutionally excessive. *State v. Pollard*, 93-0660 (La. 10/20/94), 644 So.2d 370. Further, the Louisiana Supreme Court held in *State v. Dorthey*, supra, that if, in sentencing a defendant, the trial judge were to find that the punishment mandated by a statute made no measurable contribution to acceptable goals of punishment or that the sentence amounted to nothing more than purposeful imposition of pain and suffering and was grossly out of proportion to the severity of the crime, the trial judge would have the option, indeed the duty, to reduce such sentence to one that would not be constitutionally excessive.

The sentencing record should reflect that the trial judge considered not only the seriousness of the crime and the past criminal history of the defendant, but also the defendant's personal history (including age, mental status, dependents, family ties, employment record, and health) and the potential for rehabilitation. *State v. Quebedeaux*, 424 So.2d 1009 (La. 1982). That was not done in this case. In this case, the Court only inquired as to the defendant's age.

The trial court did not refer to a pre-sentence investigative report, nor do the minutes of the trial court indicate that such a report was ever ordered. Even though a PSI is not required to be ordered by the trial court prior to sentencing, it is a valuable tool for ascertaining an appropriate sentence which is tailored to the circumstances of the particular defendant being sentenced. In *State v. Lockwood*, 439 So.2d 394 (La. 1983), the Louisiana Supreme Court recognized the importance of the PSI investigation and report to both the defendant and the integrity of the judicial system. The integrity of the judicial

system requires that any sentence must not be based merely on unsupported impression or opinion, but on conclusions rationally derived from identifiable sources; the failure to order a PSI bears relevance in concluding that there was not full compliance with Louisiana Code of Criminal Procedure Article 894.1. *State v. Alexander*, 42,957 (La. App. 2nd Cir. 2/13/08), 976 So.2d 287.

Absent a PSI or any identifiable basis for the sentencing court's observations, the reviewing court lacks the appropriate criteria by which to measure whether the sentence imposed was excessive. There was no mention by the trial court in this case as to the consideration of any of the factors required to be considered prior to imposition of sentence under Louisiana Code of Criminal Procedure Article 894.1.

It is worth noting that although the decision of whether to order a pre-sentence investigation is within the sound discretion of the trial court in accordance with Code of Criminal Procedure Article 875, the Official Reporter's Comment to this Article provides in pertinent part as follows:

"Arts. 875 and 876 are based upon Art. 531 of the 1928 Louisiana Code, as amended by Act 360 of 1960. That statute prepared and sponsored by the Parolee Rehabilitation committee, revised suspended sentence and probation procedures, incorporating many features of the A.L.I. Model Penal Code and the Standard Probation and Parole Act prepared by the National Probation and Parole Association."

Further, the author of the Official Reporter's Comments opines as follows:

"The Reporter's Comment which accompanied the corresponding section of Act 360 of 1960 aptly concluded, **"The pre-sentence investigation is the most reliable and scientific device available for sound sentencing. It serves to protect the community and the defendant from the uncertainties of 'hunch sentencing' and 'community impression.'"** (Report of Parolee Rehabilitation committee, Jan. 1960, p. 153)" Emphasis added.

Sentences are supposed to be tailored to the particular circumstances of the offense and of the offender standing before the court. That is the reason why trial courts have the authority to reduce mandatory minimum sentence if the sentence would be constitutionally excessive. *Pollard*, and *Dorthey*, supra.

In contrast to the life sentence mandated by an Aggravated Rape conviction, sentences for

Aggravated Incest for similar conduct may have been much more lenient than the twenty-five years requested by the defense. Examples of sentences given in Aggravated Incest cases are as follows: *State v. Morgan*, 06-529 (La. App. 5th Cir. 12/12/06), 948 So.2d 199 (defendant sentenced to ten years after being convicted a Aggravated Incest of his biological daughter for having simulated sex with her while she was 10 or 11 for almost every night for a two year period); *State v. D.M.*, 42,038 (La. App. 2nd Cir. 5/9/07), 958 So.2d 77 (defendant was sentenced to ten years after being convicted of committing Aggravated Incest against his grandson by performing oral sex on him, while on probation for another felony offense); *State v. Boden*, 04-1000 (La. App. 5th Cir. 3/1/05), 901 So.2d 445 (defendant sentenced to ten years for the Aggravated Incest of his niece after engaging in sexual intercourse and other sexual acts with her on several occasions); *State v. Bailey*, 41,432 (La. App. 2nd Cir. 9/20/06), 940 So.2d 95 (defendant who had a prior felony conviction, sentenced to twelve years after being convicted of committing Aggravated Incest of his stepdaughter); *State v. J.T.S.*, 2003-1059 (La. App. 3rd Cir. 2/4/04), 865 So.2d 1032 (defendant sentenced to twelve years with six of the twelve years suspended after being convicted of the Aggravated Incest of his daughter, which began at age five and continued until age twelve); *State v. Hatoph*, 99-243 (La. App. 5th Cir. 11/10/99), 750 So.2d 1036 (defendant sentenced to fifteen years for Aggravated Incest as a first offender, where he also was convicted of two counts of Oral Sexual Battery for which he received the benefit of a concurrent sentence); *State v. Watson*, 32,203 (La. App. 2nd Cir. 8/18/99), 743 So.2d 239, *writ denied*, 1999-3014 (La. 3/31/00), 750 So.2d 1036 (defendant sentenced to fifteen years after being convicted of Aggravated Incest of his stepdaughter where the abuse had occurred over a period of several years and involved oral sex and sexual intercourse); *State v. Prince*, 32,134 (La. App. 2nd Cir. 6/16/99), 742 So.2d 922 (defendant sentenced to fifteen years after being convicted of Aggravated Incest committed against his eleven year old son by touching his penis to the boy's anus on numerous occasions over a several month

period and engaging in oral sex on approximately ten occasions).

Considering the circumstances of this case, which are encompassed within the statutory definition of Aggravated Incest, and the fact that Mr. Johnson was arbitrarily chosen for prosecution under the Aggravated Rape statute instead of the Aggravated Incest statute, it was constitutionally excessive and a needless imposition of pain and suffering to sentence him to life in prison without the benefit of Probation, Parole or Suspension of sentence.

### ISSUE NO. 2

**Whether The State failed to prove beyond a reasonable doubt, every essential element of the offense that Mr. Johnson had committed Aggravated Rape of CF.**

Mr. Johnson contends that the State failed to prove beyond a reasonable doubt, every essential element of the offense that he had committed Aggravated Rape of CF. Mr. Johnson contends that The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property without due process of law." The Fourteenth Amendment imposes the same due process requirement on the States. Implicit in the due process clause is the protection of an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). An accused is entitled to an appellate review of the evidence to the extent that it supports a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, supra. The standard of review for insufficiency of evidence claim is:

> "Whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Holloway v.*

---

*McElroy*, 632 F.2d 605, 639 (5th Cir. 1980), cert. denied, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d

398 (1981)(court held that *Jackson* is to be applied retroactively); *In re Winship*, 397 U.S. 358, 90

S.Ct. 1068, 25 L. Ed. 2D 368 (1970).[1] The Due Process Clause of the Fourteenth Amendment protects

persons accused of a crime against conviction unless the State proves every element of the offense

beyond a reasonable doubt.

Both the La. Supreme Court and U.S. Supreme Court have reviewed insufficient evidence claims

raised in post conviction petitions. First and foremost, the United States Supreme Court set the standard

in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 60 (1979). On writs from the denial

of insufficient evidence claim raised in a state post conviction application. *State v. Jones*, 610 So.2d

782 (La. 1992), 91-KH-1101, *reversed*, Relator sought Post-Conviction Relief in the district court

again challenging the sufficiency of evidence. The district court denied relief. The Fourth Circuit

affirmed that ruling, and the Louisiana Supreme Court, after review of the record, concluded that

relator's claim has merit and reverse accordingly.

In *Jackson*, the United States Supreme Court reached the legal standard of review, *i.e.*, ". . .

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt ..." In the court's

view, the fact-finder's role as weigher of evidence was preserved by considering all of the evidence in

the light most favorable to the prosecution: ". . . The criterion thus impinges upon 'jury' discretion only

to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443

U.S. at 319, 99 S.Ct., at 2790, 61 L.Ed.2d at 573-574. This standard is applied with "explicit reference

to the substantive elements of the criminal offense as defined by state law." *id. at* 324 n. 16, 99 S.Ct. at

---

[1] This type of error has been recognized as patent error preventing conviction for the offense, La.C.Cr.P. art. 920(2), see indicative listing at *State v. Guillot*, 200 La. 935, 9 So.2d 235, 239 (1942). Quoting: *State v. Crosby*, 338 So.2d 584, 588 (La. 1976).

2791 n. 16. *Dupuy v. Cain*, 210 F.3d 582 (5th Cir. 2000).

In light of the overwhelming amount of inconsistent testimony, and after viewing evidence in light most favorable to prosecution, any rational trier of fact could <u>not</u> have found Mr. Johnson guilty of every essential element of the crime beyond a reasonable doubt. U.S.C.A. Const. Amend. 14. (See: *Jackson v. Virginia*, 99 S.Ct. 2781, 443 U.S. 307 (U.S. 1979); *Winship*, supra.).

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2nd Cir. 8/30/02), 827 So.2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So.2d 422. However, in this matter before the bar, justice demands that this reviewing Court interject it's Supervisory Powers to weigh the evidence presented to the jury and determine whether or not the State had presented substantial evidence of proof beyond a reasonable doubt of Mr. Johnson's guilt of every essential element of Aggravated Rape of CF.

On January 23, 1995, the United States Supreme Court in *Schlup v. Delo*, 115 S.Ct. 851 (1995) held that the appropriate standard for showing that a fundamental miscarriage of justice would result from a failure to address the claim is that of Murray *v. Carrier*, 106 S.Ct. 2639 (1986). Under Murray *v. Carrier*, the petitioner:

> "must show that the constitutional error probably resulted in the conviction of one who is actually innocent."

The Court pointed out, only truly extraordinary cases will meet this standard. Prior to *Schlup v. Delo*, the federal circuit courts have been divided on what standard is required in showing a fundamental miscarriage of justice. That is, the standards of *Kuhlmann v. Wilson*, 106 S.Ct. 2616 (1986), Murray *v. Carrier*, 106 S.Ct. 2639 (1986); or *Sawyer v. Whitley*, 112 S.Ct. 2514 (1992).

*Ward v. Cain*, 53 F.3d 106 (5th Cir. 1995), the miscarriage of justice standard as defined in *Schlup*

*v. Delo*, is "where the petitioner shows, as a factual matter, that he did not commit the crime of conviction. Ward had made no showing that it is more likely than not no reasonable juror would have found him guilty if given a correct instruction."

Mr. Johnson contends that the testimony adduced during these proceedings, along with the State's failure to produce **any physical evidence**, failed to show guilt of **any** essential element of the charged offense in this matter. The testimony of the victim (CF), along with the testimony of the State witnesses provided **no corroborating** evidence or testimony to the actual commission of this **or any offense** involving Mr. Johnson.

*State v Davis*, 498 So 2d 723 (La. 1986) impeachment ... inconsistent statements, constitutional right to impeach, A constitutional right exist to present a defense, *State ex rel Nicholas v. State of Louisiana*, 520 So.2d 377(La. 1988); and the right includes the right to impeach witnesses by prior inconsistent statements. *State v Davis*, 498 So 2d 723 (La. 1986) If that right is infringed, a conviction cannot be affirmed unless appellate review shows the constitutional violation was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2D 705 (1967); *State v. Gibson*, 391 So. 2d 421 (La. 1980).

"In Louisiana, laying a foundation remains a statutory requirement for the introduction of a prior inconsistent statement. Nevertheless, the right to present a defense is a fundamental constitutional right in a criminal case. Louisiana Constitution of 1974, Art. I, § 16 (1974). Therefore, a criminal case should protect against the technical loss of the basic constitutional right to present reliable and otherwise admissible evidence simply because defense counsel inadvertently failed to ask the simple fundamental question in advance of offering evidence of a prior inconsistent statement." *State v. Davis*, 498 So.2d 723 (La. 1986).

Furthermore, Mr. Johnson contends that the inconsistencies in the victim's testimony alone should

be sufficient to have this matter reviewed by the Higher Court. The victim's (CF) inconsistencies and perjury throughout the direct and cross-examination proved beyond a reasonable doubt that CF has failed to even corroborate the fabrications relayed throughout the investigation and proceedings of this unjust allegation against him.

CF testified that she had initially been molested in her mother's room the weekend of her brother's birthday party (Tr. p. 464). She could explicitly remember what she was wearing at the time of the sexual assault, but for some reason, could not remember the clothing of Mr. Johnson (Tr. p. 465). As CF testified in direct and cross-examination, she had failed to remember which un-truth to continue to tell. CF testified that Mr. Johnson had sexually assaulted her after her mother had been taken to work at 9:00 in the morning(486). However, she testified on cross-examination that these incidents would occur around 12:00 or 1:00 in the morning (Tr. p. 487). Furthermore, CF testified to several different sexual encounters with Mr. Johnson (Tr. pp. 463, 465, 467, 473). But, on cross-examination, CF testified that Mr. Johnson had sex with her one time (Tr. p. 474, 487). CF had also testified that her first disclosure was to Melissa (Tr. p. 472), but failed to remember that she had testified that she had told mother right after the incident (Tr. pp. 468), or that she had told her mother much later after the incidents (Tr. p. 474), and that her mother had caught them in a sexual encounter (Tr. p. 469).

CF further testified to the fact that she was not living her grandparents due to the sexual abuse by Trevor, then testified that she had moved in with her grandmother due to the sexual misconduct on the part of Mr. Johnson (Tr. p. 481). CF then testified that she had stayed with her grandparents due to her mother working at the Waffle House and CF attending the Pineview School (Tr. p. 483). CF further testified that she had notified her grandparents and that they "knew" what was happening with Mr. Johnson and herself (Tr. p. 481). Then, CF testified that her grandparents did not know until later (Tr. p. 482). CF then testified that Mr. Johnson had molested her after he had brought her mother to work at

9:00 am in the morning (Tr. p. 486). However, CF **knew** that her mother's shift started at 6:00 in the morning at the Waffle House.

Furthermore, CF testified that the report introduced into evidence stated that her grandmother did not tell her to "recant her statement" (Tr. p. 477). However, CF did admit that she had stated on the report which was introduced into evidence that "they" (mother and grandmother) had told her not to tell anyone (Tr. p. 478).

Mr. Johnson contends that in order to prove any kind of Motive on the part of CF for these allegations, the only information that this Honorable Court would really need to rely on is CF's own testimony. CF testified that she was angry with Mr. Johnson for not receiving a computer for Christmas (Tr. p. 485). CF further testified that she was angry with Mr. Johnson due to the fact that she did want to stay with her father, who had just recently been released from the penitentiary (Tr. p. 486). What better way to get her wishes of living with her father, than to tell this horrible fabrication on her mother and step-father, knowing that the both of them would be arrested (Tr. p. 495)(testifying that she knew she might have to testify against her mother also). Furthermore, CF had testified that she had informed Jo Beth Rickles that she had still loved Trevor Johnson (Tr. p. 489) and that she had sent a letter to Trevor Johnson through her mother which stated that she missed Trevor, loved him, and hoped to see him soon (Tr. p. 489). Accordingly, this does not appear to be the reaction to someone who had actually sexually assaulted her.

Mr. Johnson contends that these are just the discrepancies within the victim's own testimony during direct and cross-examination. The over-abundance of discrepancies in the testimony of the victim alone should suffice to this Honorable Court to invoke it's Supervisory Authority in this matter (Tr pp. 459-496). As the Courts have ascertained in case law that, "testimony of the victim alone is enough to substantiate a conviction," the Courts should be allowed to determine the validity of the testimony from

this victim as **unreliable** and **impeachable** as to the trustworthiness of the testimony of CF, as her testimony and statements varied from person to person, and from direct examination to cross-examination.

Mr. Johnson contends that the remarkable discrepancies throughout the investigation and trial proceedings can be noted by a mere inspection of the record. The State **failed** in it's endeavors for a valid conviction in this matter. Many of the noteworthy contradictions are as follows:

Michelle Crowley testified as to the fact that CF had changed her interviews in a manner convenient to what she wanted Ms. Crowley to hear. CF had even denied that any sexual improprieties had even happened to her (Tr. p. 387). Ms. Crowley then testified that CF had "sabotaged relationships" with her friends (Tr. p. 415). As Ms. Crowley had testified that CF was presently in counseling with her (Tr. p. 406), and that she had **no personal knowledge** of any sexual contact with Mr. Johnson (Tr. p. 415). Ms. Crowley further testified that CF was presently on medication (Tr. p. 417). Ms. Crowley testified that CF had informed her that her mom, grandmother and Aunt Monique knew that Mr. Johnson was sexually molesting her (Tr. p. 407). However, CF testified that her mom, grandmother and Aunt Monique was not informed until after the initial interview with Ms. Crowley (Tr. p. 477), that she had told her mother (Tr. p. 468), and that her mother had caught Mr. Johnson committing an act of sexual molestation (Tr. p. 469). Ms. Crowley testified that CF had reported there was no acts of anal sex (Tr. p. 421), but CF testified that there was anal sex (Tr. p. 466).

Mr. Johnson further directs this Honorable Court's attention to the Trinity Report, which CF stated that during the preliminary report that there was no sex abuse on the part of Mr. Johnson (Tr. p. 424, 425). Later, CF reported that Mr. Johnson had forced her to perform oral sex upon him, and that there was never any emission from the sexual encounters (Tr. p. 426). However, CF testified that she had to clean her sheets from this experience, as she could not lay down "in the mess" (Tr. p. 470), and that she

didn't remember which sexual encounter the emission had occurred (Tr. p. 470-471), but that the emission had occurred during the third sexual assault (Tr. p. 468).

Jo Beth Rickles testified in the State's behalf as the ACA worker responsible for the interviews involving CF (Tr. p. 429). Ms. Rickles testified as to the inconsistencies involved in this matter. Ms. Rickles stated that according to State's Exhibit 3, there was no sexual contact between Mr. Johnson and CF (Tr. p. 435). Ms. Rickles further testified that CF had reported sexual abuse, then recanted her entire story (Tr. p. 436). The most amazing statement that Ms. Rickles had testified to is that CF had informed her, "I went to someplace with someone else and she said it, so I repeated it." (Tr. p. 445). In this instance, CF is informing Ms. Rickles that she had accompanied her friend, Laura Morse, to the counselor's office in order for Laura to report the sexual assaults occurring in Laura's own household. Apparently, Laura had decided against reporting this to the counselor, so CF had instead made allegations against Mr. Johnson (Tr. p. 472).

CF had reported to Laura Morse that Trevor Johnson had been "raping" her (CF) since the 4th grade (Tr. p. 473), but testified that she had only had sex with Mr. Johnson one time (Tr. p. 474).

Ms. Rickles further testified that the interviews with CF were entirely contradictory to each other. These interviews were conducted in October of 2008 and January of 2009 (Tr. p. 433). Ms. Rickles further testified that the interviews with CF were "like pulling teeth" (Tr. p. 447) and that she had to "pull the answers out of CF" (Tr. p. 447).

Laura Morse had testified to the fact that she had told CF about the sexual assaults occurring within her household, and that she was going to report these to the school counselor (Tr. p. 456). Ms. Morse had stated that after disclosing the sexual abuse in her home, CF told her that the same thing was happening in her home and that they were both going to report their abuse to the school counselor (Tr. p. 456). Ms. Morse further informed the Court that this conversation was "towards the end of the

school year" (Tr. p. 456). Yet, CF testified that she was going just to report Laura's sexual abuse and since Laura didn't disclose anything to the counselor, CF lodged her allegations against Mr. Johnson (Tr. p. 472).

The State then proceeded to present the testimony of Jean Noto (Tr. p. 504), who had testified that she had a conversation with CF in her living room/kitchen area (Tr. p. 506). Ms. Noto further testified that she had informed CF's mother of these allegations against Trevor Johnson (Tr. p. 507). However, the State failed to have CF testify as to whether CF had confided in Ms. Noto or not. Furthermore, Ms. Noto testified that she had informed Melanie Johnson of the allegations of CF against Mr. Johnson (Tr. p. 507). However, Mrs. Melanie Johnson testified that she could not recall such a conversation with Ms. Noto (Tr. p. 689).

Next, the State presented Dr. Adrienne Atzemis as an expert witness in child abuse pediatrician (Tr. p. 510). Dr. Atzemis testified as to the fact that there was no damage to CF's hymen during the examination (Tr. p. 531). Dr. Atzemis had further testified that a hymen can repair itself even after childbirth (Tr. p. 533). Dr. Atzemis then testified as to the fact that CF had reported anal penetration by Mr. Johnson (Tr. p. 538), although the medical examination showed "normal." Dr. Atzemis then testified that CF did not cry or show emotional outbreaks during the interview (Tr. p. 538), that "kids do lie, but not about sex" (Tr. p. 539), and that teenagers also lie (Tr. p. 545). Mr. Johnson contends that if the doctor believes that a child will lie, why would she believe that they would not lie about a sexual allegation?

Dr. Atzemis virtually dodged acknowledging that CF's story could be consistent with any type of sexual misconduct NOT happening (Tr. p. 545). Dr. Atzemis had presented testimony that this household was very unstable (Tr. p. 551-552), CF's story had transformed from "Nothing came from the penis" (Tr. p. 555)(directly contradicting CF's testimony that she had to clean the sheets (Tr. p.

470)), from no oral contact (Tr. p. 556-557), to oral contact (Tr. p. 560), no anal sex (Tr. p. 558), to having anal sex (Tr. p. 560), from everything happened in the CF's room (Tr. p. 562), to things happened in different locations in the house (Tr. p. 556, 563), and CF telling her mother every time (Tr. p. 563).

Mr. Johnson contends that the defense witness also failed to corroborate CF's fabrications during direct examination and cross-examination. The State, knowing that they had failed to meet their burden in this instance, simply informed the jury that it was "a sad day that the entire family would turn on CF in favor of Trevor Johnson."

Furthermore, Mr. Johnson contends that the State's witness had failed to corroborate or re-enforce the testimony of CF in this matter before the bar. This Honorable Court should note the differences which were presented throughout the investigation and the actual trial testimony presented to the jury.

Mr. Johnson further contends that the abundance of discrepancies throughout the testimony of the State's witnesses and the victim constitutes a reasonable probability that there was a substantial abundance of perjury and inconsistencies to the State's case in this matter. Indeterminately, with the many different accounts or non-accounts presented by the State with the presentation of the testimony that was virtually impossible for any reasonable trier of fact to keep track of. Basically, the jury should have suffered from mass confusion as a result of the presentation by the State in this matter.

WHEREFORE under these circumstances, it is requested that this Court evaluate the evidence presented at trial to determine whether it was sufficient to sustain the conviction. A thorough review of the record reveals a reasonable doubt concerning Mr. Johnson's guilt of Aggravated Rape. When a conviction is reversed for insufficient evidence, the double jeopardy provision of Article I, § 15, of the Louisiana Constitution and the Fifth and Fourteenth Amendment to the United States Constitution prohibit a retrial of the defendant. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1

(1978); *State v. Williams*, 423 So.2d 1048 (La. 1982). Currently, Trevor T. Johnson should be ordered discharged, or in the alternate, this matter be reversed and remanded to the district court for further proceedings.

### ISSUE NO. 3

**Whether the trial court erred in the denial of defense counsel's motion to suppress the introduction of the partially inaudible telephone call into evidence; and Whether Mr. Johnson's conviction was obtained in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution; as the telephone call submitted to the jury was in violation of the Telecommunication Act.**

Mr. Johnson contends that the trial court erred in denying defense counsel's Motion to Suppress the introduction of a "partially inaudible" phone call into evidence for the purpose of showing guilt of this charged offense during these proceedings. Mr. Johnson avers that the defense counsel properly lodged a contemporaneous objection before the trial judge (Tr. p. 119), but was erroneously denied by the trial court before the start of the Voir Dire. Defense counsel had lodged the contemporaneous objection to the admittance of the recording of the phone calls, which violated Article 15 of the Telecommunication Act.

Mr. Johnson contends that the State and Detective Suhre failed to follow any and all procedures involved in the interception or use of these taped conversations between CF and Trevor Johnson. Pursuant to LSA-R.S. 15:1308, Detective Suhre failed to notify the Attorney General or any of his officials, the District Attorney's Office or any of his officials, and failed to obtain permission to record these conversations. Furthermore, Detective Suhre was not investigating any of the enumerated offenses under this statute for which he would have been authorized to record these conversations. Detective Suhre simply took it upon himself to record conversations which he felt would ascertain additional evidence to build his case against Mr. Johnson.

As Detective Suhre and the District Attorney's Office had failed to receive authorization for the

recording of these communications, the Attorney General's Office could have instituted, prosecuted, or intervened in this criminal action as they are authorized to. The St. Tammany Parish District Attorney's Office and Detective Suhre showed complete disregard for the law and Mr. Johnson's constitutional and statutorily protected rights as enumerated in the United States Constitution, Louisiana Constitution of 1974, and the Louisiana Code of Criminal Procedure. As the State of Louisiana has not reverted to the ways of Nazism, these recordings should have been disallowed by the trial court, as defense counsel had properly lodged a contemporaneous objection to their admittance. The trial court further disregarded Mr. Johnson's constitutional and statutory rights in siding with the State to allow these "partially inaudible" recordings to be presented to the jury without the proper foundation being laid by the State.

However, the State did propagate their disparity by failing to present Detective Suhre for the purpose of testifying to lay the foundation of these "partially inaudible" recordings. However, the State realized that this would have subjected Detective Suhre to the cross-examination by defense counsel. With the cross-examination by defense counsel, Detective Suhre would have been subjected to the scrutiny of rigorous questions as to the process of obtaining said recordings to the jury.

Mr. Johnson contends that the State failed to submit, for inspection, an application for an order authorizing or approving the interception of these "partially inaudible" communications to the defense counsel in this matter. The failure of Detective Suhre or the District Attorney's Office to submit same with the court was, in fact, an admittance that the State had failed to thoroughly investigate their authority to record these communications as to the laws as presently in effect at this time in the State of Florida, which requires and all-party consent in which to lawfully obtain these recordings and for the submitting of same into a court of law. See: LSA-R.S. 15:1310.

Wherefore, the State would have been subjected to the denial of the introduction of these "partially

inaudible" recordings of communications pursuant to LSA-R.S. 15:1307, which prohibits the use of said oral communications in the course of the proceedings lodged against Mr. Johnson, without proper authorization of one of the governing bodies that are entitled to grant the right of the recording of communications pursuant to Article 15 of the Louisiana Code of Criminal Procedure.

Mr. Johnson contends that his conviction was obtained in violation of the Fourteenth Amendment to the United States Constitution as the telephone call which was submitted to the jury was recorded in violation of the Telecommunication Act.

However, Mr. Johnson further stipulates that the monitoring of this phone call violated Federal Law, as these phone calls were between the states of Louisiana and Florida. Mr. Johnson submits that the Louisiana Law for recording a conversation during the course of a investigation is subject to one-person consent. However, calls that cross state lines become complicated legal issues especially when one state is a one-party consent and the other state is an all-party consent state. What has happened is that you didn't violate the law in the one-party consent state and violated the law in the all-party state. Moreover, since the call went across a state line, the federal laws would certainly apply. The most famous case involving this type of issue is the Linda Trip case. You will recall that Linda Trip recorded the conversations of Monica Lewinski concerning her relationship with President Clinton. Trip was in Maryland and Lewinski was in DC. Note that Maryland is an all-party consent state while DC is a one-party consent state. The law is actually quite fuzzy on these issues. The recorder and the Court is advised to assume that the stricter law would apply in each instance.

In all 50 states and through federal law, it's considered illegal to record telephone conversations outside of the one-party consent. There are only a couple of exceptions. In the state of California, one-party consent can be applied only under circumstances in which one party is involved in criminal activity which would include extortion or blackmail. In the state of Arizona, the subscriber to a

telephone service can record telephone conversations with no-party consent when criminal activity is involved. Other than those two exceptions, all other recordings outside of those states that permit one-party consent are in violation of state and federal law. The question is often asked by clients if they can record the telephone conversations of their spouse in domestic case or the conversations of their children concerning drug usage. In both of these cases, the answer is, it's unlawful. Many clients will complain that they own the telephone and pay the telephone bill, so they should therefore have a right to record what they want. However, the law doesn't address who owns the phone nor who pays the phone bill. It only addresses the use of one-party and all-party consent. Anything outside of that is a violation of state law and federal wire-tapping law.

The Federal Communications Commission goes further into details on recording telephone conversations and states that the party recording must give verbal notification before the recording and there must be a beep tone on the line to indicate that the line is being recorded.

Mr. Johnson contends that Louisiana is a one-party consent state. However, Florida is a two-party consent state. At the time of the conversation, Mr. Johnson was, in fact, in the State of Florida for an interview with the Union for which he was a member, as this was stipulated by the State and defense. Detective Ryan Suhre is heard in the background of the conversation coaching CF in the questions which he wanted presented to Mr. Johnson.

Mr. Johnson avers that CF was not at the age of consent, or having been emancipated, to allow Detective Suhre to record the communications between Mr. Johnson and herself. A person under the age of eighteen must obtain permission from their parents or legal guardian in order to make decisions about their selves or their bodies. LSA-R.S. 93.2: A. it is unlawful for any person to tattoo or body pierce any other person under the age eighteen without the consent of an accompanying parent or tutor of such person; B. It is unlawful for any business entity to pierce the body of any person under the age

of eighteen without the consent of a parent or legal custodian of such person. La.Ch.C. Art. 728 defines (2) "Child" means a person under eighteen years of age who, prior to juvenile proceedings, has not been judicially emancipated or emancipated by marriage. Under LSA-R.S. 14:93.2.2: It is unlawful for any person to replace a tooth or part of a tooth or associated tissue by means of a filling, cap, or crown made of any gold substance on any person under the age of eighteen without the consent of the parents or guardian of such person.

Furthermore, a "Child" may not even enlist in the military without the consent of their parent or guardian. LSA-29:20: a person under the age of eighteen years of age may be enlisted only with the written consent of the applicant's parents or legal representative. LSA-R.S. 37:3390.4: (2) When the person is a minor under the age of eighteen and the information acquired indicates that the child was a victim or subject of a crime, then, the person having received the information may be required to testify fully in relation thereto upon any examination, trial, or other proceeding in which the commission of such crime is subject of inquiry, unless otherwise prohibited by law.

The State of Louisiana deems a person to be a "Child" until that individual reaches the age of eighteen. As the State of Louisiana requires that a person be of the age of eighteen in order to vote, sign a contract, enter the military, consent to sex, etc., the State would deem that a "Child" under the age of eighteen cannot consent to have their communications intercepted and recorded. However, the State had failed to interject into discovery, consent from a parent or guardian was not obtain prior to the interception of these communications. If Detective Suhre had given the consent to intercept and record these communications, does that make him the guardian? Accordingly, if Detective Suhre wasn't the guardian, where was the consent from the parents?

However, the State failed to call Detective Suhre as a witness to lay the foundation for the introduction of these recorded conversation. Furthermore, the State failed to produce a warrant for the

recording of these phone conversations. The State had called Darlene Carter to testify as to the fact that she had transcribed these "partially inaudible" taped conversations (Tr. p. 574). Ms. Carter testified that she was not a certified transcriptionist (Tr. p. 576), and that she was not present during the conversation between CF and her stepfather, Trevor Johnson (Tr. p. 574-76). These tapes were then improperly presented to the jury as evidence without the proper testimony to lay the foundation.

Mr. Johnson contends that the State and Detective Suhre had procedurally defaulted the use of this recording in open court before the jury, as neither the State or Detective Suhre had authorization for the interception or recording of these conversations. LSA-R.S. 15:1308, Authorization for interception of wire or oral communications specifically stipulates the following:

§ 1308. Authorization for interception of wire or oral communications.

A. The Attorney General, or the deputy or any Assistant Attorney General acting pursuant to the authorization of the Attorney General, with the approval of the District Attorney or any Assistant District Attorney acting pursuant to the written authorization of the District Attorney in whose district the interception of wire or oral communications shall take place, and the District Attorney or authorized Assistant District Attorney, with the approval of the Attorney General or authorized deputy or Assistant Attorney General may authorize an application to a judge in whose district the interception of wire or oral communications shall take place, and such judge may grant in conformity with R.S. 15:1310 an order authorizing or approving the interception of wire or oral communications by an investigative or law enforcement officer having responsibility for the investigation of the offense as to which the application is made, when such interception may provide evidence of ...

B. Failure of the District Attorney to obtain approval for the interception of wire or oral communications as set forth in this Section shall constitute cause for the Attorney General to institute, prosecute, or intervene in a criminal action as authorized by law.

As this Article makes reference to LSA-R.S. 15:1310, Mr. Johnson contends that the State and Detective Suhre failed to follow procedures for the interception of Oral Communications. LSA-R.S. 15:1310 states in pertinent part:

LSA-R.S. 15:1310 Procedure for interception of wire or oral communication

A. Each application for an order authorizing or approving the interception or a wire or oral communication shall be made in writing upon oath and affirmation to a judge in whose district

such interception of wire or oral communication shall take place and shall state the applicant's authority to make such application. Each application shall include the following information:

(1) The identity of the investigative or law enforcement officer making the application and the person authorizing the application.

(2) A full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including:

(a) Details as to the particular offense that has been, is being, or is about to be committed,

(b) A particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted.

(c) A particular description of the type of communications sought to be intercepted, and

(d) The identity of the person, if know, committing the offense and whose communications are to be intercepted

(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous, or that such circumstances exist that without immediate action a human life may be endangered.

D. (1) Each order authorizing or approving the interception of any wire or oral communication shall specify:

(a) the identity of the person, if known, whose communications are to be intercepted.

(b) The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted.

(c) A particular description of the type of communication sought to be intercepted and a statement of the particular offense to which it relates.

(d) The identity of the agency authorized to intercept the communications, the person applying for the application, and the person authorizing the application.

Mr. Johnson further relies on the provisions of LSA-R.S. 15:1307, Prohibition of use as evidence of intercepted wire or oral communications in this matter. As the State has introduced these recordings to the jury as evidence of admittance of the commission of a crime against CF, the trial court failed to enforce the laws as set forth in the Louisiana Code of Criminal Procedure. LSA-R.S. 15:1307 states in pertinent part:

§ 1307. Prohibition of use as evidence of intercepted wire or oral communications

A. Whenever any wire or oral communication has been intercepted, no part of the contents of

such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, Grand Jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state, or a political subdivision thereof, if the disclosure of that information would be in violation of this Chapter.

Furthermore, Section 605 of the Federal Communications Act provides that no person who, as an employee, has to do with the sending or receiving of interstate communication by wire shall divulge or publish it or its substance to anyone other than the addressee or his authorized representative or to subpoena issued by a court or competent jurisdiction or on demand of other lawful authority; and "No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

In *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939), the United States Supreme Court, Judge Roberts gave his opinion stating that: "We nevertheless face the fact that the plain words of Section 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that "no person" shall divulge or publish the message or its substance to "any person." To recite the contents of the message in testimony before a court is to divulge the message. The same considerations may well have moved Congress to adopt Section 605 as evoked the guaranty against practices and procedures violation of privacy, embodied in the Fourth and Fifth Amendments of the Constitution. For years controversy has raged with respect to the morality of the practice of wire tapping by officers to obtain evidence. It has been the view of many that the practice involves a grave wrong and in any case, should be reversed or prevented."

In *U.S. v. Polakoff*, 112 F.2d 888 (2nd Cir. 1940), the U.S. Court of Appeal for the Second Circuit, the opinion by Judge L. Hand, Circuit Judge states: "Every telephone talk, like any talk, is antiphonal; each party is alternately sender and receiver and it would deny all significance to the privilege created by Section 605 to hold that because one party originated the call he had power to surrender the others'

privilege. There cannot be the least doubt of this as to the answers of the party the party called up; and while it might indeed be pedantically argued that each party had the power to consent to the interception of at least so much as he said, that would be extremely unreal, for in the interchange each answer may, and often does, imply by reference some part of that to which it responds. It is impossible satisfactorily so to dissect a conversation, and the privilege is mutual; both must consent to the interception of any part of the talk." In the case of Trevor Johnson, no consent was on his part. The statute does not speak of physical interceptions of the circuit, or of "taps." It speaks of "interceptions" and anyone intercepts a message to whose intervention as a listener communicates do not consent; the means he employs can have no importance; it is breach of privacy that counts. Here, however, we need not be troubled by niceties, because no matter what the scope of any such implied consent, it cannot extend to the interception of prosecuting agents bent upon trapping either party criminally. A fair trial cannot be obtained with the admission of telephone records.

In *U.S. v. Fallon*, 112 F.2d 894 (2nd Cir. 1940), Second Circuit Court of Appeals, the opinion of Judge L. Hand and Augustus N. Hand, Circuit Judges stated that: "This case is controlled by the opinion handed down here with the case of *U.S. v. Polakoff*. The declarations of the accused over the telephone were even more damaging than the *Polakoff*'s case and certainly determined the verdict. A recording apparatus was interposed in the telephone circuit in the house of the prosecution's chief witness, who was then acting in conjunction with Agents of the investigation, after all had been arranged, called up the accused and their talk was recorded. This was repeated another time. Just as in the case of Trevor Johnson. The Judges stated, "We see no reason for adding to what we have already said in the companion case (The *Polakoff* case), and the judgment was reversed; and a new trial was ordered.

The Petitioners and the government alike refer to the context of the critical clause, and the

legislative history of the Communications Act, the former to demonstrate that all communications are protected from interception and divulgence; the latter to prove that the language of the Act must be more narrowly intercepted to cover only interstate and foreign communications.

Section 605 renders all communications inadmissible, and is prejudicial error for the trial court to admit them into evidence, either by the defendant or by the prosecution.

Mr. Johnson contends that the State and Detective Suhre failed to follow any and all procedures involved in the interception or use of these taped conversations between CF and Trevor Johnson. Pursuant to LSA-R.S. 15:1308, Detective Suhre failed to notify the Attorney General or any of his officials, the District Attorney's Office or any of his officials, and failed to obtain permission to record these conversations. Furthermore, Detective Suhre was not investigating any of the enumerated offenses under this statute for which he would have been authorized to record these conversations. Detective Suhre simply took it upon himself to record conversations which he felt would ascertain additional evidence to build his case against Mr. Johnson.

As Detective Suhre and the District Attorney's Office had failed to receive authorization for the recording of these communications, the Attorney General's Office could have instituted, prosecuted, or intervened in this criminal action as they are authorized to. The St. Tammany Parish District Attorney's Office and Detective Suhre showed complete disregard for the law and Mr. Johnson's constitutional and statutorily protected rights as enumerated in the United States Constitution, Louisiana Constitution of 1974, and the Louisiana Code of Criminal Procedure. As the State of Louisiana has not reverted to the ways of Nazism, these recordings should have been disallowed by the trial court, as defense counsel had properly lodged a contemporaneous objection to their admittance. The trial court further disregarded Mr. Johnson's constitutional and statutory rights in siding with the State to allow these "partially inaudible" recordings to be presented to the jury without the proper foundation being laid by

the State.

Free speech and associated rights guaranteed by the First Amendment of the United States Constitution. Privacy rights are guaranteed by the Fourth Amendment of the United States Constitution.

In 1972, the Court decided in *U.S. v. U.S. District Court*, 407 U.S. 297 (1972)(The *Keith* case) and held that, for unlawful electronic surveillance even in domestic security matters, the Fourth Amendment requires a prior warrant.

The Fourth Amendment of the United States Constitution consist of the right of the people to be secure in their persons, house, papers, and effects, against reasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Justice Powell, in writing for the Court in the *Keith* Case also wrote that:

> Lord Mansfield's formulation touches the very heart of the Fourth Amendment directive: that, where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation. Inherent in the concept of a warrant is it's issuance by a "neutral and detached magistrate." (citation omitted). The further requirement of "probable cause" instructs the magistrate the baseless searches shall not proceed. *U.S. v. U.S. District Court*, 407 U.S. at 316.

The Fourth Amendment, accordingly, was adopted to assure that Executive abuses of the power to search would not continue in our nation.

Justice White wrote in 1984 in *U.S. v. Karo*, 468 U.S. 705 (1984), "a case involving installation and monitoring of a beeper which had found it's way into a home, that a private residence is a place in which society recognizes an expectation of privacy; that warrant-less searches of such places are presumptively unreasonable, absent exigencies. Id. at 714-715. *Karo* is consistent with *Katz* where Justice Stewart held that:

"Over and again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to Judicial Process," (citation omitted) and that searches conducted outside the Judicial Process, without prior approval by Judge or Magistrate, are per se unreasonable under the Fourth Amendment – subject only to few specifically established and well-delineated exceptions. *Katz*, 398 U.S. at 357.

Justice Powell's opinion in the *Keith* Case also stated that:

The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that un-reviewed executive discretion may yield too readily to pressures. But the threat of prosecution for protected expression is not longer real and substantial.

For all the reasons outlined above, the defendant's motion to dismiss the claim against Mr. Johnson should be granted because litigation of that claim would require violation of the defendant's First and Fourth Amendments of the United States Constitution and the Statutory Law.

However, the State did propagate their disparity by failing to present Detective Suhre for the purpose of testifying to lay the foundation of these "partially inaudible" recordings. However, the State realized that this would have subjected Detective Suhre to the cross-examination by defense counsel. With the cross-examination by defense counsel, Detective Suhre would have been subjected to the scrutiny of rigorous questions as to the process of obtaining said recordings to the jury.

Mr. Johnson contends that the State failed to submit, for inspection, an application for an order authorizing or approving the interception of these "partially inaudible" communications to the defense counsel in this matter. The failure of Detective Suhre or the District Attorney's Office to submit same with the court was, in fact, an admittance that the State had failed to thoroughly investigate their authority to record these communications as to the laws as presently in effect at this time in the State of Florida, which requires and all-party consent in which to lawfully obtain these recordings and for the submitting of same into a court of law. See: LSA-R.S. 15:1310.

Wherefore, the State would have been subjected to the denial of the introduction of these "partially inaudible" recordings of communications pursuant to LSA-R.S. 15:1307, which prohibits the use of said oral communications in the course of the proceedings lodged against Mr. Johnson, without proper authorization of one of the governing bodies that are entitled to grant the right of the recording of communications pursuant to Article 15 of the Louisiana Code of Criminal Procedure.

However, the State would submit to this Honorable Court that this case falls under the exception of LSA-R.S. 15:1303, Interception and disclosure of wire, electronic, or oral communications, which states in pertinent part:

(3) It shall not be unlawful under this Chapter for a person acting under color of law to intercept a wire or oral communication, where such a person is a party to the communication or one of the parties to the communication has given prior consent to interception. Such a person acting under color of law is authorized to possess equipment used under such circumstances.

(4) It shall not be unlawful under this Chapter for a person not acting under color of law to intercept a wire or oral communication where such a person is a party to the communication or where one of the parties to the communication has given prior consent to such interception, unless such communication is intercepted for the purpose of committing any criminal or tortuous act in violation of the constitution or laws of the United States or of the state or for the purpose of committing any other injurious act.

However, Federal Law requires that the State of Louisiana follow the guidelines of both the state for which the call originated and the state in which the call was received. As stated above, the State of Florida requires an all-party consent for the interception and recording of a communication. 18 U.S.C.A. § 2510 et seq.

Wherefore, as the State has improperly introduced these tapes into evidence without first laying a proper foundation, proper authority to record, violating Florida Law for the all-party consent, violated Federal Law, the trial court erred in admitting same into evidence for the jury. Detective Suhre was well aware that Mr. Johnson was in Florida for a interview with the Union for which Mr. Johnson was a member, in search of a better position to provide more adequately for his family, knew that Mr.

Johnson would try his best to "cut the conversation short." As defense counsel had pointed out the trial court, any statement can be construed to say what a person wants it to say. "Have you stopped beating your wife?" The State had misconstrued and "twisted" the conversations between Mr. Johnson and CF to sound as if Mr. Johnson had admitted guilt to the allegations lodged against him. However, as explained during the proceedings, Mr. Johnson was simply trying to hurry the conversation along in a manner as to not be rude to his step-daughter. In all actuality, there was no admittance of any improprieties on the part of Mr. Johnson, just concern as to where CF was calling from, as the number she had called from was not a number that he was familiar with.

*Babb v. Eagleton*, N.D.Okla. 2007, 616 F.Supp.2d 1195 states that, neither ex-wife nor her current husband qualified for "Consent Exception," based on her purported consent on behalf of her minor children with ex-husband to recording of telephone conversations between ex-husband and children, in ex-husband's suit under Title III of Omnibus Crime Control and Safe Streets Act; ex-wife intercepted conversation for self-serving reason of bolstering her motion in state court to modify joint custody plan and not based on good-faith belief that her consent was necessary to protect children's interest.

Simply put, Detective Suhre had violated Mr. Johnson's constitutional rights in obtaining a recording of the conversation, which was greatly misinterpreted by the State and the jurors, and should not have been submitted for evidence in this matter. The State has **FAILED** to submit any **PROOF** that this intercepted phone conversation between Mr. Johnson and the alleged victim was legally obtained, as the interception is in violation of the United States Constitution and also the Louisiana Constitution of 1974 in that he has been subjected to conviction with evidence that has been illegally obtained through this investigation. Furthermore, as noted above, Detective Suhre had **FAILED** to obtain any type of warrant for the recordation of such, nor had he obtained **PERMISSION** from **ANYONE** of legal age for same. The alleged victim **WAS NOT** of age to consent for the interception of this phone

call (which was across state lines, in violation of the Federal Law).

WHEREFORE, for reasons stated above, this Honorable Court should rule that these tapes were improperly obtained and admitted into evidence by the trial court. This matter should be reversed and remanded to the trial court for a new trial, with the exclusion of these improperly obtained and submitted communications from the evidence.

ISSUE NO. 4

**Whether the trial court erred in allowing the state to strike two African-American prospective jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).**

*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that when the State racially exercise its peremptory challenges to excuse black potential jurors from the petit jury on the account of their race, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is violated. The Court set forth the standard that a defendant must establish to prove a prima facie case of purposeful discrimination. Under this standard, the defendant must show that he is a member of a cognizable racial group, and that the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race. Second, defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Third, defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Id., 106 S.Ct. at 1723.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. The prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on

the assumption -- or his intuitive judgment -- that they would be partial to the defendant because of their shared race. Id., 106 S.Ct. at 1723.  Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selection. Id., 106 S.Ct. at 1723-1724.

*State v. Collier*, 553 So.2d 815, 820 (La. 1989) what the prosecutor must do is articulate a neutral explanation related to the particular case to be tried. Id., at 1724.  This neutral explanation must be clear, reasonably specific, legitimate and related to the particular case at bar.  That once the prosecutor gives its neutral explanation, the Court must then determine if the defendant has established purposeful discrimination. Id., 106 S.Ct. at 1724.  That because the trial judge's finding involves a credibility evaluation, his findings are given great deference on review. Id., at 822.

*Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 1866 (1991), the Supreme Court held that "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing became moot." *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), held that the Sixth Amendment requires that jury venire be drawn from a fair cross section of the community.

*Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), held that a State's purposeful or deliberate denial to blacks of an opportunity to serve as jurors solely on account of race violates the Equal Protection Clause of the Fourteenth Amendment.  In order to establish a prima facie case of discrimination under Swain, a defendant had to demonstrate that the peremptory challenge system had been perverted.  A defendant could raise an inference of purposeful discrimination if he showed that the prosecutor in the county where the trial was held in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be has been

responsible for the removal of qualified blacks who had survived challenges for cause, with the result that no blacks ever served on petit juries.

The *Swain* evidentiary requirement necessary to make out a prima facie case of racial discrimination was overruled in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that a defendant can establish a prima facie case by showing that he is a member of a cognizable racial group that the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race, and that those facts and any other relevant circumstances raised an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Once the defendant makes out a prima facie case of discrimination, the burden shifts to the prosecutor to come forward with a neutral explanation for challenging black jurors.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), the Supreme Court explicitly held that the Equal Protection Clause of the 14th Amendment prohibits State prosecutors from striking prospective jurors from the petit jury on the basis of race. The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner: First, the claimant must make a prima facie showing that the peremptory challenges have been exercised on the basis of race. Second, if the requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination. *U.S. v. Bently-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993); *Haynes v. Quarterman*, 561 F.3d 535 (5th Cir. 2009).

As to the first element of *Batson*, counsel made a prima facie showing that the State's peremptory strikes were targeted at specifically removing African-Americans from the jury. The State used two (2) strikes. Each of the two (2) were to strike African-Americans, members of Appellant's racial/ethnical

group. The Court has held that the requisite showing of racial discrimination can be demonstrated by the fact that 1). peremptory challenges constitute a jury selection practice that permits those to discriminate who are a mind to discriminate, and 2). that the facts and circumstances raise an inference that the prosecutor exercised peremptory challenges on the basis of race. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712; *Price v. Cain*, 560 F.3d 284 (5th Cir. 2009).

In order to make a prima facie showing to satisfy the first element of *Batson*, the Supreme Court explained: "We did not intend the first step to be so onerous that a defendant would have to persuade the judge - - on the basis of all the facts, some of which are impossible for the defendant to know with certainty - - that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirement of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410 (2005). The Fifth Circuit in *Price v. Cain*, supra, interpreted this language as being "simple and without frills." It is beyond logical debate, the record clearly establishes a pattern allowing the reasonable inference to be drawn that the State's strikes were racially motivated. Two (2) peremptory challenges were used; Two (2) African-American's of appellant's racial/ethnical group were selectively and purposefully targeted and struck from the jury. It was then incumbent upon the Court to conduct further inquiry, as the burden shifted to the State to articulate race-neutral explanations for the peremptory challenges.

Mr. Johnson contends that defense counsel properly lodged a contemporaneous objection to the State using peremptory challenges to dismiss the only two prospective African-American jurors from this trial. As it was, in this group of twenty potential jurors, there were only two African-Americans in this panel. However, the State peremptorily struck both of these from the jury. These two are Mr. Sidney Harris, a well-respected law enforcement officer in Orleans Parish, and Mr. Walli Haqq. As the

State and defense counsel had already challenged one African-American for cause, defense had properly raised a contemporaneous objection to the State dismissing these other two African-Americans from the jury.

Accordingly, the State had used Strike Number Two to dismiss Mr. Sidney Harris. The colloquy for the strike is as follows (Tr. p. 277-278):

| THE COURT: | Juror No. 86, Sidney Harris. |
|---|---|
| MR. GARNER: | State 2. |
| MR. BURNS: | Judge, at this point - - and again, I'd like the record to reflect that on this group of 20, there were only two black folks. Would ask the record to reflect that my client is African-American, or black. We already took one off for cause, and we have now the only black person or African-American person of the jury. And how is this man - - |
| | My thought is, is that I'd ask the State to give us some reason why they excluded the only black male on the thing, particularly in the fact that it's race neutral. This man is a law enforcement officer in Orleans Parish. And so I object to the State using a peremptory exception on this juror. |
| THE COURT: | I'll note it for the record. I'm going to ask the State to do that, but it's hard to establish a pattern when you're only talking about one juror that's being excused by the State. |
| MR. BURNS: | Well, it might be a pattern of one, Judge. St. Tammany Parish, we have less than 10 percent of the people that are African-American in this state, and they're only a group of two out of a group of 20 here. Anyway, so that's my - - |
| THE COURT: | I'll ask Mr. Gardner to give us a statement as to why he excused Mr. Harris. |
| MR. GARDNER: | And I understand that the Court is not making a decision that there has been a pattern, but I also understand my obligation, and I'm glad to provide a race neutral reason. |
| | Mr. Harris looked me in the eye when I asked him if he could convict based upon the testimony of one witness, and he said: "I can't." I then asked the question several different ways, and he has convinced me that he can't. |
| THE COURT: | Thank you. |

After the dismissal of this African-American potential juror, the State further dismissed Mr. Walli Haqqi, an African-American. First, the State had challenged Mr. Haqqi for cause, which the Court had

denied (Tr. p. 365-365). After the Court had denied the State's challenge for cause, the State then used a

peremptory challenge to dismiss Mr. Haqqi (Tr. p. 368-369). As to the State's challenge for cause, Mr.

Johnson offers the following colloquy (Tr. p. 365-366):

MR. CUCCIA:        Mr. Haqqi.

MR. BURNS:         I disagree. Let me say this, I don't think he's cause at all. I heard nothing.

THE COURT:         I think initially he was, but I think he was rehabilitated. Denied.

    Mr. Johnson now submits to this Honorable Court the colloquy for the State's challenge for

peremptory dismissal (Tr. p. 368-369):

THE COURT:         Juror No. 84, Walli Haqq., to the State.

MR. GARDNER:       State 8.

MR. BURNS:         Judge at this time, I'd like to object. In this panel, there were 23 people who
                     were in the jury venire. One, Mrs. Meilleur, was let go for cause because of
                     her - - whatever she said in the record, which I don't need to repeat. That
                     leaves 22. That leaves one black man who is serving on the jury here. That's
                     two out of two that the State has cut.

    And so now it's a pattern of two out of two, and we think that there's no excuse for the State to cut

him.

THE COURT:         Well, I heard Mr. Haqq's answers to the questions, but I'm going to let the
                     State give us a race neutral answer.

MR. GARNER:        Judge, this juror made it unmistakable to me in my questions that without
                     something besides one witness, he could not convict; that the penalty would
                     cause him to not convict; that the coalescence between the two, the one-on-
                     one and the penalty, would cause him not to convict. And I'm convinced he
                     would not convict bases upon the credibility of one witness.

THE COURT:         And while I did not grant his challenge for cause, I think there's - - that's - - I
                     would have concern if I was in the State's shoes about his responses also.

                     Note your objection for the record.

MR. BURNS:         Note my objection, Your Honor. Thank you very much.

    However, after a mere inspection of the record in this matter, this Honorable Court will see that the

trial court had denied Mr. Johnson his constitutional and statutorily protected rights in allowing the State to dismiss these two African-Americans from the jury.

## ISSUE NO. 5

**Whether the Court abused its discretion by denying the Motion for New Trial.**

Mr. Johnson contends that the Court erroneously denied his Motion for New Trial during the course of this matter. Mr. Johnson was denied a fair trial in the fact that the alleged victim's father had made "outbursts" during the course of this trial.

The alleged victim's father is no stranger to the judicial system, as testimony has shown that he was recently released from the Louisiana State Penitentiary at Angola, Louisiana. However, this "outburst" came at a very critical stage of the proceedings, and obtained the desired relief. What better way to influence the jury for a guilty verdict than to continuously "storm" in and out of the courtroom at critical times during the course of the trial.

What better way to "tug at the heartstrings" of the jurors and greatly prejudice a defendant in a proceeding than to "act out" on emotional feelings before the jury. One would naturally feel that the father of the alleged victim is compelling to the fact that a defendant is, in fact, guilty of the charges against him, and GREAT motivation for a finding of guilt. A charge as serious as this is already a tough decision for a normal person to make a decision. Even though a man's life is at stake in these proceedings, ANY LITTLE prejudice shown a defendant is detrimental to the outcome.

Furthermore, if Mr. Johnson would have been the one "disrupting" the proceedings by a showing of "ranting," the Judge would have admonished the jury to disregard such actions by the defendant. In this case, the Judge failed to admonish the jury as to disregarding the "outbursts" which had occurred during the course of the trial.

Mr. Johnson's attorney properly raised this issue during the Motion for New Trial, as Mr. Johnson

had been greatly prejudice by this "disruption." However, the district court had denied same at the onset of the sentencing phase.

Accordingly, La.C.Cr.P. Art. 851. Grounds for new trial states in pertinent part:

**Art. 851. Grounds for new trial**

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled as a matter of strict legal right.

According to the Historical notes of La.C.Cr.P. Art. 851, in paragraph (b), The first paragraph, taken almost verbatim from Art. 508 of the 1928 Code, stresses the basic requirement that the irregularities complained of in a motion for a new trial must have resulted in the doing of an injustice to the accused. In addition to the general requirement, it is particularly important to stress this harmless error concept in connection with ground (2) and (4), irregularities or defects in the proceedings. As the statements and testimony in its entirety obviously fell below the standard of sufficiency, Mr. Johnson contends that the father's actions in the presence of the jury resulted in an extreme injustice in this matter.

Mr. Johnson's Fourteenth Amendment rights to the United States Constitution were violated, as he was denied a fair trial due to the "outbursts" of the alleged victim's father at critical stages of the trial. The trial court's denial of the Motion for New Trial has greatly prejudiced him, as the Court had noted such, and was informed by defense counsel that the disruption was made in the presence of the jury.

Wherefore, as stated above, this "outburst" in the presence of the jury has greatly prejudiced Mr. Johnson, as the verdict is surely attributable to the verdict.

## ISSUE NO. 6

**Whether the trial court abused its discretion by accepting the non-unanimous verdict of guilt by the jury.**

Louisiana Constitution of 1974, Art. I § 17 (A) allowing non-unanimous jury verdicts and the enabling statute, La.C.Cr.P. Art. 782, violate Equal Protection under the Fourteenth Amendment and Article I, Section Three (3) of the Louisiana Constitution of 1974, because the constitutional provision's enactment was motivated by an express and overt desire to discriminate against blacks on account of race and because the provision has had a racially discriminatory impact since its adoption.

Unlike the familiar Sixth Amendment challenge to this State's non-unanimous jury regime, a challenge to the Louisiana Supreme Court has rejected, the Equal Protection challenge presented in this case has not bee addressed on merits by any court. See: *State v. Bertrand*, 6 So.3d 38 (La. 3/17/09). Despite its apparent novelty, this claim follows from a straightforward application of settled United States Supreme Court jurisprudence that holds that any law that has a racially discriminatory impact and that was enacted with a racially discriminatory motive violates Equal Protection notwithstanding that the law may be facially neutral. *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

For example, in *Hunter v. Underwood* the Supreme Court affirmed that lower court's invalidation of an Alabama law that disenfranchised persons convicted of certain misdemeanors. The Court concluded that although the law was facially neutral with respect to race, the law violate Equal Protection because it had the effect of disenfranchising a disproportionate percentage of blacks and because the law was passed in the Alabama Constitutional Convention of 1801, a which the "zeal for white supremacy ran rampant." *Hunter*, 471 U.S. at 229. The Court further noted that Alabama's constitutional convention "was part of a movement that swept the post-Reconstruction South to disenfranchise blacks." Id

As shown below, pursuant to *Hunter* and the cases upon which it relies, that a non-unanimous guilty verdict pursuant to La.C.Cr.P. Art. 782 and Louisiana Constitution, Art. I, 17 (A) is invalid because racial discrimination was a "substantial" or "motivating" factor behind the enactment of the Louisiana non-unanimity provision and the provision continues to have a racially discriminatory effect. See Id, at 227-28.

## DISCRIMINATORY INTENT

The non-unanimous jury provision was incorporated into the Constitution of 1898 as part of an effort "to perpetuate the supremacy of the Anglo-Saxon race in Louisiana." "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Evidence of any improper motive may be gleaned from the "historical background" of the law, including the "specific sequence of events leading up to" its enactment, "particularly if it reveals a series of official actions taken for invidious purposes." Id at 267 (citations omitted). One potential "highly relevant" source of such evidence includes "contemporary statements by members of the decision making body, minutes of its meeting, or reports." Id at 268.

Another indication of any improper motive may include an otherwise unexplained "substantive departure" from a law usually regarded as important. Cf. Id at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached.")(footnote and citations omitted). Finally, an indication of improper motive may arise when the impact of the law "bears more heavily on one race than another." Id at 266, quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Just as the ordinary "sort of difficulties" typically associated with trying to

ascertain congressional intent were absent in *Hunter* (471 U.S. at 228), each of these factors overwhelmingly supports the conclusion that Louisiana's non-unanimous jury provisions were the product of racially discriminatory intent as the histories of both laws are nearly identical, having arisen from the same overtly racist movement identified in *Hunter*.

Originally, the State of Louisiana had provided for the common law right to trial by jury, including unanimity of jury verdicts. By the Act of 1805, the Territory of Orleans adopted the forms and procedures of the common law of England in this criminal proceedings, including " the method of trials." Act of 1805, § 3 3; See generally Voorhies A.A. *Treatise on the Criminal Jurisprudence of Louisiana*, Bloomfield & Steel (1860), pp. 3-10. Following the Civil War and pursuant to the Military Reconstruction Act of 1867, a Constitutional Convention was convened in Louisiana with equal numbers of blacks and white delegates. Vincent, Charles M. "Black Constitutional Makers: The Constitution of 1868. "*In Search of Fundamental Law*: Louisiana's Constitutions, 1812-1974 (1993). The 1868 Constitution enshrined Louisiana's first Bill of Rights, which was modeled on the Federal Bill of Rights and included the right to trial by jury, La C Art. VI (1868).

After federal troops withdrew from New Orleans in 1877, southern Democrats immediately seized political control, electing a democratic governor and winning three quarters of the seats in the legislature by 1878. By April 1879, a Constitutional Convention had been called, and a new Constitution was ratified in December 1879. See: Abbe, Ronald M. "That the Reign of Robbery Will Never Return to Louisiana" *In Search of Fundamental Law*, (1993). To the disappointment of many Democrats, however, the Constitution of 1879 did not take significant steps to turn back the civil rights granted to black citizens during reconstruction. The limited steps taken in 1879 are explained by the circumstances at that time; one quarter of the legislature remained hostile to Democrats, the possibility of a return by federal troops lingered, and fears of a mass exodus of black citizens from the state

threatened the economy. Id.

Through the early 1890's, while the white Democrats maintained power, black citizens continued to make up the majority of registered voters, and the Democrats feared their voting power and the possibility of an alliance between blacks and working class whites. Close call election victories had shaken up the Democrats and added urgency to the need to cement their power and to remove blacks and poor whites from meaningful participation in Louisiana's political and civil institutions. Furthermore, only a few years earlier, in 1880, the United States Supreme Court decided in *Strauder v. West Virginia*, 100 U.S. 303 (1880), which held that the Fourteenth Amendment prohibited states for excluding persons from jury service based upon race. It was against this backdrop and "a desire of Louisiana's reactionary oligarchies to disfranchise blacks and poor whites (which) prompted the Constitutional Convention of 1898." (See: Lanza, Michael L. "Little More than a Family Matter: The Constitution of 1898." *In Search of Fundamental Law*. pp. 93-109.

The 1889 Constitutional Convention was designed to produce a constitution that would entrench white power once and for all, and to ensure this goal; sweeping changes to election laws were passed immediately prior to the convention. The effect was that when the people were asked by referendum to vote on whether to have a Constitutional Convention and to nominate delegates, black voter registration had dropped by ninety (90%) percent. Id at 98. As a result of this legislative disenfranchisement, the 134 delegates at the 1898 Convention were all white and the resulting constitution was ratified without being submitted to a popular vote. Id at 98-99.

The statements by members of the decision making body also support a finding of discriminatory intent. Like the delegates to the 1901 Alabama Convention discussed in *Hunter*, Louisiana's all white delegates were "not secretive about their purpose." 471 U.S. at 229. As the President of Constitutional Convention, E.B. Kruttschnitt, stated in his opening address:

I am called upon to preside over a little more than a family meeting of the Democratic party of the State of Louisiana ... We know that this convention has been called together by the people of the State to eliminate voters who have during the last quarter of a century degraded our politics.[2]

And in closing argument, President Kruttschnitt bemoaned that the delegates have been constrained by the Fifth Amendment from achieving "universal white manhood suffrage and the exclusion from the suffrage of every man with a trace of African blood in his veins." Id at 380.

He went on to proclaim:

I say to you, that we can appeal to the conscience of the nation, both judicial and legislative and I don't believe that they will take the responsibility of striking down the system which we have reared in order to protect the purity of the ballot box and to perpetuate the supremacy of the Anglo-Saxon race in Louisiana. [Id at 381].

This overtly racial sentiment was echoed in the closing remarks of Honorable Thomas J. Semmes, who stated in the "mission" of the delegates had been "to establish the supremacy of the white race in this state." Id at 374. In sum, Louisiana's political climate and the dynamics of the Louisiana Convention were exactly the same as those of its neighbors in Alabama in 1901.

Further, evidence of discriminatory intent is apparent from the unexplained "substantive departure" from the universal, unquestioned, long-standing, well established rule in Louisiana that jury verdicts must be unanimous. No explanation, independent of the trumpeted mission of re-establishing white supremacy, can be found to explain this unprecedented action.

Finally, there is little doubt that the impact of the law "bears more heavily on one race than another." As juries in 1898 were highly unlikely to contain more than three black jurors, the absolute nullification of the votes of the "peers" of black defendants was highly likely. On the other hand, the possibility that a white defendant would face a predominately black jury was quite small or nonexistent.

---

2   See: Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana, 8-9 (1898).

Considering these factors together, it is rather easy to see what the Louisiana legislators were thinking when they decided to dispense with the centuries-old mainstay of common law criminal justice: the unanimous jury verdict. Quite simply, with non-unanimous verdicts, African American citizens charged with a crime were more likely than whites to end up being convicted if the votes of the one or two potentially sympathetic black jurors who might end up on the jury can be nullified by the votes of the remaining white jurors. Given that felons cannot vote, and given the overtly racial animus of these white legislators, the intended disenfranchising effect of the new law is undeniably apparent.

Indeed, the direct racially disenfranchising effect of Louisiana's non-unanimous -verdict provision is even more obvious and more insidious than the statute struck down in *Hunter*. Unlike Alabama's certain misdemeanors can't vote provision, for which the racial motivation behind its passage is not self-evident, the discriminatory purpose of Louisiana's non-unanimous-jury provision is quite obvious.

Plainly, racial discrimination was a substantial or motivating factor behind the enactment of Louisiana's non-unanimous-jury provision that has survived several constitutional conventions and has even undergone a change from a requirement that a guilty verdict must rest on a vote of 9-3 to the current 10-2 requirement. Such a concern was addressed in *Hunter*:

> At oral argument in this Court, the appellant's counsel suggested that, regardless of the original purpose of § 182, events occurring in the succeeding 80 years had legitimated the provision. Some of the more blatantly discriminatory selections, such as assault and battery on the wife and miscegenation, have been struck down by the courts, and appellants' contend that the remaining crimes-felonies and moral turpitude misdemeanors – are acceptable bases for denying the franchise.

> Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*.[3]

In other words, the failure of well-intentioned lawmakers does not purge the taint of that law. The non-unanimity requirement as born of racial animus and subsequent constitutional conventions do not

---

3   471 U.S. at 232-33.

change that fact, irrespective of the slight ameliorative tweaking of the provision that occurred when a legal verdict was changed from nine jurors to ten jurors.

## DISCRIMINATORY EFFECT

Regarding discriminatory effect, blacks as members of a minority are mathematically much more likely than whites t make up no more than two of the twelve jurors, and as a result of racially discriminatory jury-selection methods, juries actually consist of two or less black jurors for more often than is statistically expected.

Pursuant to Art. 116 of the 1898 Constitution, jury trials were abolished for misdemeanors and were reduced to trial by jury of five or lesser felonies. The requirement of unanimity was removed for all other felonies except capital offenses. In cases where hard labor was the required punishment, defendants were to be tried before a jury of twelve, requiring only nine to concur to render verdict.

At that time, blacks represented 14.7% of all citizens registered to vote in Louisiana. Thus, proportionate representation on juries would have seen and average of two black jurors per trial. The selection of nine votes for a verdict served to guarantee white-majority control overwhelmingly jury verdicts.

As a matter of simple mathematics, as long as blacks remain a minority in this state, they will necessarily constitute a minority of jurors, thereby raising the risk that their presence marginalized even under the current system that permits a conviction to stand on the concurrence of 10 out of 12 jurors. Moreover, within a system of majority verdicts, it becomes easier to conceal discriminatory intent in the use of peremptory challenges. At the same time, a majority-verdict system make the impact of race-based peremptory challenges more dramatic. Any prosecutor who is of a mind to discriminate knows that the needs to only secure ten out of twelve votes to obtain a conviction. He can conceal his illicit intent by eliminating all but one or two token black jurors. This strategy was even observed by the

Louisiana Supreme Court in a case involving a *Batson* violation:

> Because only ten votes were needed to convict defendant of Armed Robbery, the prosecutor
> could have assumed, contrary to *Batson*'s admonition that it was unacceptable to do so, that all
> black jurors would vote on the basis of racial bias and then purposefully discriminated by
> limiting the number of blacks on the jury to two ... This pattern of striking all black jurors
> (except two) continued in the face of mounting pressure by the trial court to select a jury more
> representative of the black population of the parish.[4]

Over 40 years ago, Justice Potter Stewart warned about the Louisiana's flawed system: "[Ten]

jurors can simply ignore the views of their fellow panel members of a different race or class," *Johnson*

*v. Louisiana*, 406 U.S. 366, 397 S.Ct. 1620, 32 L.Ed.2d 152 (1972)(Stewart, J., dissenting). The risk

that the black community and black jurors have been denied a guarantee of meaningful participation in

jury deliberations is simply too great to tolerate any longer.

Non-unanimous juries convict disproportionately greater number of blacks than whites. It is

obviously true that convictions are easier to obtain when juries do not require unanimity to convict. It

necessarily follows that juries in Louisiana convict more persons than they would if unanimity were

required. While black citizens make up only 33% of Louisiana's population, they comprise 76% of

Louisiana's prison population.[5] It simply cannot be denied that the law, which was born of overt racism,

disproportion adversely affects black persons.

Louisiana's non-unanimous jury system is unconstitutional because it violates the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution and Article One, Section Three

(3) of the Louisiana Constitution of 1974.

Accordingly, Mr. Johnson was convicted of the crime by a margin of 11-1. This Court should note

that a life sentence in the State of Louisiana is similar to that of a death penalty, as an offender is

---

4   *State v. Collier*, 553 So.2d 815, 819-20 & 823 (La. 1989)(footnotes omitted). See also: *State v. Cheatham*, 986 So.2d
    738, 734 (La. App. 5th Cir. 5/27/08)("[Defense counsel] pointed out that it appeared the prosecutor was attempting to
    ensure that only two African-Americans would serve on the jury. And in order to convict, the prosecutor needed only 10
    votes.").

5   Http://www.gibbsmagazind.com/blacks_in_prisons.htm.

---

meticulously guaranteed that he will **NEVER** see the light of day as a free man, and is virtually

sentenced to die in incarceration. Although the State may submit the fact that Mr. Johnson may apply

for a Pardon in twenty years; it should be noted that offenders sentenced to death are also able to apply

for a Pardon. Hence, showing that this life sentence is really a **"Virtual Death Penalty,"** or **"Death by**

**Incarceration."**

WHEREFORE, for the foregoing reasons, this Honorable Court should reverse this non-unanimous

verdict and Grant the desired relief in this matter.

## ISSUE NO. 7

**Whether the Court abused its discretion with the acceptance of the expert witness
testimony.**

Mr. Johnson contends that his constitutional rights were violated with the introduction of the State's

expert witness in this matter. Dr. Adrienne Atzemis was accepted by the Court without prior notice to

the defense. However, it should be noted the only purpose of such is to prejudice Mr. Johnson and add

credibility to the alleged victim's testimony to allow the State to place the burden of proof upon the

defendant in a case such as this.

In *State v. Allen,* this case was taken to the Louisiana Supreme Court and the ruling of the trial

court was vacated. The case was remanded to the trial court for a pre-trial evidentiary hearing on the

issue of prior false allegations made by the victim. In the event, the court determines there are prior

false allegations of sexual molestation by the victim. The defendant shall be allowed to cross-examine

and to present evidence regarding same at trial. This is the opinion given on the matter at hand which is

in the trial court of St. Tammany Parish 22nd Judicial District Court, Division "D". Decided April 30,

1997.

In *State v. E. Smith, Jr.,* which was taken to the Louisiana Supreme Court where the ruling from

the trial court was reversed and remanded for a new trial on the basis of their opinion that granted

certiorari to consider defendant's assertion that the trial court improperly precluded him from introducing evidence of prior false allegations of molestations made by the victim. They concluded that when a defendant seeks to introduce evidence that the victim made prior false allegations of molestation. The issue is one of credibility and LSA-C.E. Art. 412 are inapplicable. To the extent, *State v. Allen* suggests otherwise, is overruled. In this case, the defense counsel argued that the evidence was not barred by Art. 412 because the allegations were false and not of prior sexual behavior, but rather evidence of the victim's state of mind.

It was stated by the Judges of the Supreme Court, that they granted certiorari to address defendant's argument that defense counsel should have been allowed to present to the jury testimony and cross-examination of witnesses regarding the allegation of prior molestation, which were subsequently recanted, to impeach the victim's credibility at trial. *State v. Smith*, 98-2045 (La. 1/8/99), 734 So.2d 646.

As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. LSA-C.E. Art. 607 (C).

In *State v. Allen*, the defendant argues the evidence that the victim had previously made accusations of molestation and then retracted them is not in evidence of past sexual behavior of the victim, but rather impeachment evidence used to attack the victim's credibility, and agreed upon.

In *State v. Everidge*, 96-2647 (La. 12/2/97), 702 So.2d 680, "Here, by attempting to introduce evidence that the victim had accused her cousin of molestation and then retracted the accusation, the defendant sought to prove for impeachment purposes that the victim had, in the past, made false allegations regarding sexual activity." Evidence offered to prove allegedly false prior claims by the victim is not barred by Rule 412.

Because of the outcome of this case rested entirely upon the jury's perception of the victim's veracity, the trial court's ruling regarding the victim's prior false allegations of sexual molestation cannot be said to be harmless. Therefore, because defendant had been prejudiced by the confused and erroneous state of the law applied in his case and because his right to a fair trial has been impeded, we must reverse the conviction and remand the case to the trial court for a new trial, was the conclusion.

Under LSA-C.E. Rule 609.1(C), only the name of the offense, the date of conviction, and the sentence are admissible. The prosecutor is not allowed to cross-examine or elicit testimony concerning the details of the previous conviction unless the following occurs: (1) the defendant denies having been convicted or deny recollection of such; (2) testify to exculpatory facts or circumstance surrounding the conviction; or (3) when the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Prior to the Code of Evidence, the introduction of prior convictions were governed statutorily by LSA-R.S. 15:495, which provided that evidence of conviction is admissible for the purpose of impeaching the witness' credibility.

Before evidence of the prior conviction could be introduced by other source other than the witness being impeached, the witness must first be questioned on cross-examination as to the conviction and distinctly fails to admit having been convicted. There was no explicit statement from the courts as to how far the prosecutor can go into the details of a prior conviction for impeachment purposes.

*State v. Jackson*, 307 So.2d 604, 608 (La. 1975), the Supreme Court held that a witness may be cross-examine as to the details of a conviction for the purpose of establishing the true nature of the offense. This rule of law was later applied to a defendant who takes the stands in his own defense.

*State v. Oliver*, 387 So.2d 1154, 1156 (La. 1980), Justice Watson writing for the majority of the court noted that the *Jackson*, decision has been severely criticized. He stated that even the leeway

allowed by *Jackson*, has its limits, and a "trial court has the duty of restricting an inquiry into details of a past conviction within reasonable bounds." Id, at 1555. He cautioned that *Jackson*, must be narrowly construed and care must be taken to avoid prejudice to the right of the accused. the Supreme Court stated that the *Jackson* rule must be narrowly construed and care must be taken to avoid prejudice to the right of the accused. In *State v. Oliver*, the defendant was tried and convicted of first degree murder. He had been previous convicted of attempted armed robbery. He was accused of raping one of the victim of that robbery. During Oliver's first degree murder trial, he took the stand in his own defense. The prosecutor questioned him about the rape. There was no evidence in the record that Oliver raped anyone. However, the trial court permitted the questioning, ruling that the facts of the prior conviction is proper for the jury consideration in light of *State v. Jackson*. On appeal, the Supreme Court pointed out that its decision was not governed by the *Jackson*. The Court reversed Oliver's conviction because the prosecutor used the alleged rape for which the defendant was not charged to attack his credibility.

*State v. Connor*, 403 So.2d 678, 680 (La. 1981), the Supreme Court stated that *Jackson* should be limited to questions related to prior convictions rather than prior arrests or charges, and that only limited questions as to the facts of the prior conviction is permissible. Id, at 680. Minor details relating to conditions of probation, alleged but uncharged offenses and charges dropped in response to a guilty plea may not be used to cast doubt on a defendant's credibility.

### EXPERT TESTIMONY

In *State v. Foret*, 620 So.2d 821 (La. 1993), this case was taken to the Louisiana Supreme Court where the defendant applied for writs of certiorari to this court, which were granted. Upon review, this Court reverses the court's decisions that the tardy delivery of the psychologist's report was not prejudicial, especially when given the questionable scientific basis and highly influential nature of his

testimony. As this alone is grounds for reversal of the conviction and remand for a new trial.

The Court failed to consider whether this type of testimony was itself properly admitted into evidence, considering the significant problems that this type of testimony has created in other jurisdictions as recognized by reservations expressed by the concurring Justices in *State v. Brossette*, 599 So.2d 1092 (La. 1992)(Dennis and Hall, J.J., concurring): The introduction of expert opinion testimony as to the psychological characteristics of the victim or her testimony is fraught with serious *res nova* constitutional and evidentiary problems. While this type of evidence is absolutely not admissible for some purposes ... but might be admissible for others, it should be allowed only after careful study under strict control by the trial court.

LSA-C.E. Art. 702 set forth the general rule for the admissibility of expert testimony in Louisiana. Subsumed in the requirements of rule 702 is the premise that expert testimony must be reliable to be admissible. The reliability of expert testimony is to be ensued by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of a "preliminary assessment" by the trial court.

The Court also stated other rules of evidence govern this testimony, mainly LSA-C.E. 403, which is a balancing test that will exclude probative evidence if outweighed by it's potential for unfair prejudice. The Court noted the possibility that the expert's testimony can be quite misleading and prejudicial if it's gate-keeping role is not properly satisfied, requiring of the methodology surrounding the testimony and it's conclusions.

In this case they also cite other cases such as *State v. Cantanese*, 368 So.2d 975 (La. 1979) and states that *Cantanese* set forth a probative value versus prejudicial effect balancing test, focusing upon concerns that the trier of fact might assign too much weight to the expert opinion. The quality of such evidence, and the existence of either judicially or legislatively created "procedural safeguards"

\\Mepd05\ICS\Lp-dconstance80\My Documents\clients\Johnson\Johnson T. #384076\Johnson Trevor MOL-EDLA.odt

*Trevor Johnson v. N. Burl Cain, Warden*                                    56.

regulating the admissibility of such evidence at trial.

In this case, it was also stated that the record was silent regarding any efforts by the trial court to determine, via some sort of evidentiary hearing, whether or not the psychologist's confidence in his ability to diagnose sexual abuse (based on the "dynamics" system known in the field as Child Sexual Abuse Accommodation Syndrome) was well founded. If the trial court had conducted a hearing, it might have discovered the misgivings many experts and courts alike with this type of testimony that utilizes the SCAAS as a basis for determining whether or not abuse has indeed occurred.

In the absence of such a hearing, only a scientific method's proven "inherent reliability" will allow the court to take judicial notice of the accuracy of scientific testimony and evade the requirement for an evidentiary hearing on the reliability of such testimony. See *State v. Rimmash*, 775 P.2d 388, 398 (Utah 1989). The *Rimmash* Court went on to note that CSAAS was not inherently reliable so as to justify a court's taking judicial notice of the reliability of such testimony.

In this case, it was stated that even experts utilizing CSAAS for determinations of the existence of abuse have been compelled to admit that "the evaluation of a child is partly an art form." Thus, the use of this technique for determination of the victim's truthfulness in his or her allegations of abuse is not one that, even after peer review, has been embraced by the scientific community. Due to this failure, use of CSAAS-like techniques for determinations of the existence of abuse fails to satisfy the Frye element or ("general acceptance" in the community).

This type of testimony has been labeled as so inherently unreliable that they cannot aid decision making in the criminal justice system.

The clinician observer applying his or her own theory is simply unreliable.

It is logical that this Court should be reluctant to allow it to be used for a purpose which it was not intended a credibility evaluation tool.

Therefore, this Court finds that this type of evidence is of highly questionable scientific validity, and fails to unequivocally pass the *Daubert* threshold test of scientific reliability. In any capacity, it is highly unlikely that it will be useful to a jury on the issue of witness' credibility, especially as a tool for determining whether or not abuse actually occurred.

Even assuming that CSAAS-based testimony or expert testimony itself does indeed pass the *Daubert* threshold test for scientific validity, we now explore whether or not it's use to bolster the victim's credibility was improper so as to unfairly prejudice the defendant.

Testimony by an expert is not particularly helpful to a jury that must rely upon own common sense as a barometer for the evaluation of truthfulness. The cases all seem to focus on, in the face such expert testimony, fears of the jury surrendering it's own common sense in weighing victim testimony and deferring to a diagnosis was nothing more than a subjective opinion favoring the victim.

One of the early cases on this matter has been repeatedly followed is *United States v. Azure*, 801 F.2d 336 (8th Cir. 1986). There, the Court held that a pediatrician's comment on whether or not the victim was indeed telling the truth about being the victim of sexual abuse was held to be reversible error: It states ... Credibility, however, is for the jury. The jury is the lie detector in the courtroom ... It is now suggested that psychiatrists and psychologists have more expertise in weighing veracity of a witness than either Judges or juries, and that their opinions can be of value to both Judges and juries in determining credibility, perhaps. The effect of receiving such testimony, however, may be two fold: First, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is collateral but still an important matter.

Other jurisdictions agree with this reasoning on the subject of expert testimony on abuse victim's credibility. In *Commonwealth v. Seese*, 512 Pa. 439,517 A.2d 920, 922 (Pa. 1986), the Pennsylvania Supreme Court noted that this type of expert testimony was "an encroachment upon the province of the

jury." The Court emphatically stated that: To permit expert testimony for the purposes of determining the credibility of a witness would be an invitation for the trier of fact to abdicate it's responsibility to ascertain facts relying upon the questionable premise that the expert is in a better position to make such a judgment.

The Court also stated that if experts were permitted to testify as to the credibility of a particular class of witnesses such as abused children, then one could imagine "experts" testifying as to the veracity of the elderly, various ethnic groups, or members of different religious faiths, of persons employed in various trades or professions, etc. The result would be to encourage jurors to shift their focus from determining the credibility of the particular witness who testified at trial, allowing them instead to defer to the so called "expert" assessment of the truthfulness of the class of people of which the particular witness is a member. In addition, such testimony would imbue the opinions of "experts" with an unwarranted appearance of reliability on a subject, veracity, which is not beyond the facility of the ordinary juror to assess.

Courts have also been concerned with unfair prejudice to the defendant from this type of expert testimony. Prejudice can result from the testimony's giving "fact finders ... little more than a false sense of security based on the incorrect assumption that a reasonable accurate scientific explanation for behavior has been proved" *Morse*, at 1026. This testimony on credibility has the effect of "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony. *Azure*, supra, at 340. This "stamp" has the effect of "so bolstering a witness' testimony ... as to increase it's probative strength with the jury and ... it's admission may in some situations on this basis constitute reversible error." *Homan v. United States*, 279 F.2d 767, 772 (8th Cir.).

A child's recollection of the event is another factor for the jury to determine when weighing credibility and we believe it would impermissibly infringe upon their determination to permit expert

testimony on this point. As such, we find that it was error to admit an expert's testimony on the subject of delay of reporting, omission of details, and the inability to recall dates and times.

This sentiment was echoed by the Court in *State v. Gibson*, 391 So.2d 421, 428 (La. 1980): Our state constitution and statutory harmless error rule admonish a reviewing court generally to shun factual questions and to reverse only when substantial rights of the accused have been affected.

When considering the erroneous admission of evidence, this Court has set out the test to be "whether there is a reasonable probability that the evidence might have contributed to the verdict, and whether the reviewing court is prepared to state beyond a reasonable doubt that it did not." *State v. Walters*, 523 So.2d 811 (La. 1988).

In this instance, the State's case is based largely upon the testimony of the victim. The inadmissible expert testimony served to unduly bolster this testimony and, in all probability, made it much more believable to the jury. Consequently, the jury would probably gave the testimony of the victim more weight than it, standing alone, would have otherwise received. Given this effect of the expert's testimony, this Court is not prepared to state that, beyond a reasonable doubt, the testimony of the psychologist had no effect on the guilty. Thus, the prejudice created an error is not harmless, and warrants reversal.

Dr. Adrienne Atzemis' testimony was used as a factor to show proof of the alleged victim's testimony. Simply put, the State has presented this "expert testimony" to allow the jury to be lulled into the confidence that although the State has failed to prove its case against Mr. Johnson, a verdict of "guilty" is just and right. Testimony such as this allows the State to obtain conviction without corroborating testimony or physical evidence.

*Federal Constitution Violation:*

Mr. Johnson contends that his conviction was obtained in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Also, his sentence is in violation of the Eighth Amendment to the United States Constitution.

Mr. Johnson was denied the Due Process rights which are guaranteed him through the Amendments to the United States Constitution throughout these proceedings, along with the freedom of life, liberty, and property without the right to Due Process.

*Effect:*

Mr. Johnson was denied his Due Process. Along with the fact that his conviction was obtained in violation to clearly established federal law as determined by the United States Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## CONCLUSION

**WHEREFORE, PREMISES OF MR. JOHNSON CONSIDERED:**

Petitioner, Trevor Johnson, respectfully prays that this Honorable Court will accept his foregoing *Memorandum of Law in Support of Petition for Federal Habeas Corpus* and consider same in concert with his *Petition for Federal Habeas Corpus* pursuant to *28 USC § 2254*. Petitioner, Trevor Johnson, further prays that this Honorable Court, after due consideration of the law and the facts presented by Petitioner in these proceedings, that Petitioner is granted federal habeas corpus and that his underlying state conviction and sentence is reversed and remanded back to the state district court for further proceedings.

Respectfully submitted this 1ˢᵗ day of February, 2016.

Trevor Johnson, #384076
MPWY/Oak-2
La. State Penitentiary
Angola, LA  70712

## CERTIFICATE OF SERVICE

I, Trevor Johnson, hereby certify that I have served a true and correct copy of the above and foregoing upon the Respondent, through the District Attorney of St. Tammany Parish, by placing same in the Institution's Legal Mail System for depositing in the U.S. Mail, properly addressed and with proper, first-class postage pre-paid, on this 1ˢᵗ day of February, 2016.

Trevor Johnson