## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

TREVOR JOHNSON                                    CIVIL ACTION

VERSUS                                             NO. 16-927

N. BURL CAIN, WARDEN                           SECTION: "H"(1)

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Trevor Johnson, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On July 21, 2011, he was convicted of aggravated rape under Louisiana law.[1]  On September 8, 2011, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On June 8, 2012, the Louisiana First

---

[1] State Rec., Vol. 4 of 9, trial transcript, p. 770; State Rec., Vol. 1 of 9, minute entry dated July 21, 2011; State Rec., Vol. 1 of 9, jury verdict form.

[2] State Rec., Vol. 4 of 9, transcript of September 8, 2011; State Rec., Vol. 1 of 9, minute entry dated September 8, 2011.

Circuit Court of Appeal affirmed that conviction and sentence.[3]  The Louisiana Supreme Court then denied petitioner's related writ application on January 25, 2013.[4]

On January 10, 2014, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on February 10, 2014.[6]  His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on January 12, 2015,[7] and May 4, 2015,[8] and by the Louisiana Supreme Court on January 8, 2016,[9] and February 26, 2016.[10]

Petitioner also filed the instant federal application seeking habeas corpus relief.[11]  The state filed a response, conceding that the application is timely and that petitioner exhausted his remedies in the state courts.[12]  Petitioner filed a reply to the state's response.[13]

## **Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that

---

[3] State v. Johnson, No. 2011 KA 2240, 2012 WL 2061678 (La. 1st Cir. June 8, 2012); State Rec., Vol. 5 of 9.
[4] State v. Johnson, 105 So.3d 711 (La. 2013); State Rec., Vol. 6 of 9.
[5] State Rec., Vol. 7 of 9.
[6] State Rec., Vol. 7 of 9, Order dated February 10, 2014.
[7] State v. Johnson, No. 2014 KW 1552 (La. App. 1st Cir. Jan. 12, 2015); State Rec., Vol. 7 of 9.
[8] State v. Johnson, No. 2015 KW 0221 (La. App. 1st Cir. May 4, 2015); State Rec., Vol. 7 of 9.
[9] State ex rel. Johnson v. State, 182 So.3d 947 (La. 2016); State Rec., Vol. 7 of 9.
[10] State ex rel. Johnson v. State, 187 So.3d 472 (La. 2016); State Rec., Vol. 9 of 9.
[11] Rec. Doc. 1.
[12] Rec. Doc. 10.
[13] Rec. Doc. 11.

state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the

United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings. It preserves
> authority to issue the writ in cases where there is no possibility fairminded jurists
> could disagree that the state court's decision conflicts with this Court's precedents.
> It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard
> against *extreme malfunctions* in the state criminal justice systems, *not a substitute
> for ordinary error correction through appeal. As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the state court's ruling
> on the claim being presented in federal court was so lacking in justification that
> there was an error well understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein. White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## **Facts**

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this

case as follows:

> According to the victim, C.F.,[FN1] the defendant, her stepfather, began
> touching her inappropriately in 2005, when she was nine or ten years old. The
> defendant's actions progressed to sucking her breasts and attempting to force her

to perform oral sex when she was about eleven years old. The victim also stated that the defendant had sexual intercourse with her, specifically testifying that he put his "stuff" or penis inside her vagina. The victim ultimately disclosed the acts to a school counselor, Melissa Desforges. She was interviewed at the Children's Advocacy Center (C.A.C.) in 2008, but did not make any disclosures during the initial interview. After undergoing counseling, the victim was interviewed by C.A.C. again in 2009, and at that time, she disclosed acts done by the defendant, including inappropriate touching and vaginal sexual intercourse.

> [FN1] Herein the victim will be referred to by initials only. See La. R.S. 46:1844(W). At trial, the victim testified that her date of birth is January 25, 1996. However, the indictment, as well as the victim's statement in a taped interview at the Children's Advocacy Center in January 2009, reflect that her birthday is on January 26.[14]

## Petitioner's Claims

## Excessive Sentence Claim

Petitioner's first claim is that his sentence is excessive. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant challenges the constitutionality of the sentence imposed. The defendant notes that the elements of aggravated incest and aggravated rape were both implicated by the facts of this case. The defendant contends that the statutory scheme leaves the sentencing up to the whim of the prosecutor. Thus, the defendant specifically argues that the trial court abused its discretion in imposing a life sentence because he could have been charged with aggravated incest instead of aggravated rape. The defendant notes that while the aggravated rape charge exposed him to a mandatory sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence, a charge of aggravated incest would have reduced his sentencing exposure to a range of twenty-five to ninety-nine years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant argues that the redundancy in statutory definitions with vastly different penalty exposures makes the imposition of a mandatory life sentence arbitrary and unconstitutional under the facts presented by this case.
>
> In further support of his argument, the defendant notes that based on the statutory schemes, defendants who are similarly situated are not being treated the same. He contends there are no guidelines in place to prevent favoritism, or to

---

[14] State v. Johnson, No. 2011 KA 2240, 2012 WL 2061678, at *1 (La. 1st Cir. June 8, 2012); State Rec., Vol. 5 of 9.

instruct the prosecution as to which cases to prosecute as aggravated rapes and which ones to prosecute as aggravated incest. The defendant also notes that the trial court did not order a presentence investigation (PSI) report or consider the sentencing guidelines of La. C. Cr. P. art. 894.1. Citing several jurisprudential examples, the defendant notes that in contrast to the life sentence mandated by an aggravated rape conviction, sentences for aggravated incest for similar conduct have been more lenient than the twenty-five years requested by the defense in an oral motion for reconsideration of the sentence imposed. The defendant concludes that the life sentence, under the instant circumstances, constitutes a needless imposition of pain and suffering.

The Eighth Amendment to the United States Constitution and Article I, Section 20, of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). A sentence is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Andrews, 94-0842, pp. 8-9 (La.App. 1st Cir. 5/5/95), 655 So.2d 448, 454. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. See State v. Holts, 525 So.2d 1241, 1245 (La.App. 1st Cir. 1988). Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of La. C. Cr. P. art. 894.1 need not be recited, the record must reflect that the trial court adequately considered the criteria. State v. Brown, 02-2231, p. 4 (La.App. 1st Cir. 5/9/03), 849 So.2d 566, 569.

In State v. Dorthey, 623 So.2d 1276, 1280-81 (La. 1993), the Louisiana Supreme Court recognized that if a trial judge determines that the punishment mandated by the Habitual Offender Law makes no measurable contribution to acceptable goals of punishment or that the sentence amounts to nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime, he is duty bound to reduce the sentence to one that would not be constitutionally excessive. However, the holding in Dorthey was made only after, and in light of, express recognition by the court that the determination and definition of acts that are punishable as crimes are purely legislative functions. It is the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies. Moreover, courts are charged with applying these punishments unless they are found to be unconstitutional. Dorthey, 623 So.2d at 1278.

In State v. Johnson, 97-1906 (La. 3/4/98), 709 So.2d 672, the Louisiana Supreme Court re-examined the issue of when Dorthey permits a downward departure from a mandatory minimum sentence, albeit in the context of the Habitual

Offender Law.  The Court held that to rebut the presumption that the mandatory minimum sentence was constitutional, the defendant had to "clearly and convincingly" show that:

> [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

Johnson, 97-1906 at p. 8, 709 So.2d at 676 (quoting State v. Young, 94-1636, pp. 5-6 (La.App. 4th Cir. 10/26/95), 663 So.2d 525, 531 (Plotkin, J., concurring), writ denied, 95-3010 (La. 3/22/96), 669 So.2d 1223).  While both Dorthey and Johnson involved mandatory minimum sentences imposed under the Habitual Offender Law, it has been held that the sentencing review principles espoused in Dorthey are not restricted in application to the penalties provided by La. R.S. 15:529.1.  See State v. Fobbs, 99-1024 (La. 9/24/99), 744 So.2d 1274, 1275 (per curiam); State v. Henderson, 99-1945, p. 19 (La.App. 1st Cir. 6/23/00), 762 So.2d 747, 760 n. 5, writ denied, 00-2223 (La. 6/15/01), 793 So.2d 1235; State v. Davis, 94-2332, pp. 11-12 (La.App. 1st Cir. 12/15/95), 666 So.2d 400, 407-08, writ denied, 96-0127 (La. 4/19/96), 671 So.2d 925.  Under La. R.S. 14:42(D)(1), it is provided that a person convicted of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

While the defendant argues that he could have been charged with aggravated incest, we note that in our system of justice, we entrust vast discretion to the prosecutor in deciding which cases to pursue and what crimes to charge.  In re Toups, 00-0634, p. 10 (La. 11/28/00), 773 So.2d 709, 715.  The district attorney has broad discretion in both the institution and handling of criminal prosecutions.  La. Const. art. V, § 26(B); La. R.S. 16:1(B); La. C. Cr. P. art. 61; State v. Walker, 00-0334, p. 5 (La.App. 1st Cir. 12/22/00), 775 So.2d 663, 666, writ denied, 01-0235 (La. 12/7/01), 803 So.2d 23.  Conduct that is criminal under several articles may be prosecuted under either provision at the discretion of the district attorney.  La. R.S. 14:4; State v. Juluke, 374 So.2d 1259, 1260 (La. 1979).  Moreover, the district attorney has discretion which offense to charge when the facts support different charges, even when the penalties for the offenses differ.  Walker, 00-0334 at p. 5, 775 So.2d at 666; State v. Smith, 597 So.2d 1151, 1153 (La.App. 1st Cir.), writ denied, 599 So.2d 311 (La. 1992).

We further note that ordering a PSI is discretionary with the trial court; there is no mandate that a PSI be ordered.  See La. C. Cr. P. art. 875(A)(1).  Such an investigation is an aid to the court and not a right of the accused.  The trial court's failure to order a PSI will not be reversed absent an abuse of discretion.  State v. Wimberly, 618 So.2d 908, 914 (La.App. 1st Cir.), writ denied, 624 So.2d 1229 (La. 1993).  Further, the failure to articulate reasons for the sentence as set forth in Article 894.1 when imposing a mandatory life sentence is not an error, as

articulating reasons or factors would be an exercise in futility, since the court has no discretion. State v. Felder, 00-2887, p. 13 (La.App. 1st Cir. 9/28/01), 809 So.2d 360, 371, writ denied, 01-3027 (La. 10/25/02), 827 So.2d 1173.

       Herein, the defendant declined to make a statement before the sentence was imposed. The trial court noted that the defendant's actions destroyed his family's harmony and will have a severe impact upon his family and the victim in this case for many years. The defendant has not presented any particular facts regarding his family history or special circumstances that would support a deviation from the mandatory life sentence provided in La. R.S. 14:42(D)(1). Based on the record before us, we find that the defendant has failed to show that he is exceptional or that the mandatory life sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. Thus, we do not find that a downward departure from the mandatory life sentence was required in this case. The sentence imposed is not excessive; thus, the counseled assignment of error lacks merit.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[15]

To the extent that petitioner is claiming that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding. Federal habeas corpus relief is available only to correct violations of federal constitutional law, and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law. See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v. Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

---

[15] State v. Johnson, 105 So.3d 711 (La. 2013); State Rec., Vol. 6 of 9.

On the other hand, to the extent that petitioner is claiming that his sentence is excessive under *federal* law, that claim obviously is cognizable; however, it is also meritless for the following reasons.

In <u>Solem v. Helm</u>, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts." <u>United States v. Gonzales</u>, 121 F.3d 928, 942 (5th Cir. 1997) (citing <u>Rummel v. Estelle</u>, 445 U.S. 263, 274-76 (1980)). "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." <u>Gonzales</u>, 121 F.3d at 942 (quotation marks omitted). "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare." <u>Id</u>. (quotation marks omitted).

Interpreting <u>Solem</u> in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence. Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

<u>McGruder v. Puckett</u>, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that <u>Rummel v. Estelle</u>, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment." <u>Gonzales</u>, 121 F.3d

at 943.  In <u>Rummel</u>, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law.  Nevertheless, we can say with certainty that the life sentence approved in <u>Rummel</u> falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

<u>Gonzales</u>, 121 F.3d at 943 (footnote omitted).

Here, the trial court imposed the sentence provided by Louisiana law.  Moreover, petitioner's crime, aggravated rape, was particularly serious.  In light of those considerations, as well as the finding in <u>Rummel</u> that a life sentence was not excessive for the relatively minor offenses involved in that case, this Court cannot conclude that petitioner's sentence for his much graver offense is grossly disproportionate under federal law.  See <u>Edwards v. Butler</u>, 882 F.2d 160, 167 (5th Cir. 1989) ("[L]ife without parole for aggravated rape under the Louisiana statute does not offend the eighth amendment proportionality analysis of <u>Solem v. Helm</u>, and Edwards' eighth amendment claim is meritless.").  Because the sentences are not grossly disproportionate, this Court's "inquiry is finished."  <u>Gonzales</u>, 121 F.3d at 942.

Lastly, the Court notes that petitioner also complains about his sentence on the basis that he was charged with a crime carrying a severe penalty (aggravated rape) despite the fact that he could instead have been charged with a similar crime carrying a lesser penalty (aggravated

incest).[16]  He argues that the prosecutor's ability to elect to proceed on the more onerous charge

violates petitioner's right to equal protection.  However, that contention is foreclosed by United

States v. Batchelder, 442 U.S. 114 (1979).

>     In Batchelder, the Supreme Court explained:

>> This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.  Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.

Id. at 123-24 (citations omitted).  The Supreme Court further held:

>> The prosecutor may be influenced by the penalties available upon conviction [when deciding among possible charges in a particular case], but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.  Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced.

Id. at 125 (citations omitted).  Accord United States v. Lawrence, 179 F.3d 343, 348 (5th Cir.

1999) ("In keeping with the need to avoid judicial second-guessing of prosecutorial decisions, we

have never held that similarly situated defendants must be treated identically.  We allow the

government discretion to decide which individuals to prosecute, which offenses to charge, and

what measure of punishment to seek."); Ehrlich v. United States, 238 F.2d 481, 485 (5th Cir. 1956)

("It is settled law that where a single act violates more than one statute, the government may elect

to prosecute under either.  A defendant cannot complain merely because the charge against him is

brought under the statute carrying the more serious penalties when two statutes punish the same

general acts." (citation omitted)).

---

[16] Although the aggravated incest statute in effect at the time carried a lesser penalty, the Court notes that it was nevertheless still quite severe, carrying a potential maximum sentence of ninety-nine years imprisonment.

## Sufficiency of the Evidence Claim

Petitioner's second claim is that there was insufficient evidence to support his conviction.

On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant contends that in light of inconsistencies and the absence of physical or corroborating evidence, the State failed to prove beyond a reasonable doubt every essential element of the offense. The defendant contends that during the victim's testimony, she revealed that the motive for making the instant allegations was that she wanted to live with her biological father and because she was angry that she did not receive a computer for Christmas. The defendant notes that the victim expressed her love for him verbally and in a letter, adding that she did not appear to react as if he had assaulted her. The defendant further contends that the discrepancies in the evidence confused the jury and that the guilty verdict should be reversed.
>
> In reviewing the sufficiency of the evidence to support a conviction, a Louisiana appellate court is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard of appellate review, adopted by the legislature in enacting La. C. Cr. P. art. 821 (pertaining to motions for postverdict judgment of acquittal based on insufficiency of evidence), is whether or not the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. See State v. Brown, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18, cert. denied, 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006). The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 01-2585, p. 5 (La.App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
>
> Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir. 1984). Accordingly, our role is not to assess credibility or reweigh evidence. State v. Smith, 94-3116, p. 2 (La.10/16/95), 661 So.2d 442, 443. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Higgins, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
>
> Rape is defined as the commission of anal, oral, or vaginal sexual intercourse with a person without the person's lawful consent. La. R.S. 14:41(A).

"Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41(B).  Oral sexual intercourse is defined as the intentional engaging in any of the following acts with another person:  (1) the touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender; (2) the touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim. La. R.S. 14:41(C).  Aggravated rape is defined, in pertinent part, as a rape committed where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of thirteen.  La. R.S. 14:42(A)(4).

L.M. testified that she became close friends with the victim when they were in the fifth grade.  L.M. was sixteen years old at the time of the trial.  At some point, the victim and L.M. had a conversation about the defendant in the victim's bedroom at her grandmother's home.  L.M. stated that the victim was "upset and down" at the time and needed someone to talk to.  After the disclosure, L.M. suggested that the victim tell her grandmother, but the victim became afraid and L.M. agreed not to tell anyone.  During their sixth-grade school year, the girls approached the school counselor, and the victim told the counselor what happened.  During cross-examination, L.M. stated that she had also been sexually abused, but that was not the topic of the conversation with the school counselor.

As a result of the victim's disclosures, Jo Beth Rickles, an expert witness and forensic interviewer with the C.A.C., first interviewed the victim in October of 2008.  Rickles confirmed that the victim denied or recanted allegations in the initial interview.  Rickles noted that recantation is very common, as disclosure of this type causes embarrassment and fear of getting in trouble or causing family turmoil; therefore, victims find it easier to just say it did not happen.  Rickles also indicated that the victim's mother brought her to the initial interview.  Rickles did not recall the victim's mother bringing her to the second interview and noted the victim was not living with her mother at the time of the second interview.

During the initial C.A.C. interview, the victim stated she lied to her school counselor about being raped by her stepfather because her friend L.M. had been raped, and she did not want her to feel alone.  The victim also stated that she loved her stepfather and that despite her claims, he did not rape her.  She stated that she was embarrassed and scared and did not want to be there.  The victim also stated that her mother was mad about it and that she only made the claim to make her friend feel better.  The victim further stated that her grandmother told her that she should not have lied.  She acknowledged that she previously indicated that the first incident occurred when she was in the fourth grade, but insisted that L.M. was actually abused in fourth grade, and she only copied the information.  She stated that if the defendant had raped or touched her, she would have called the police.  She stated that she did not know if her mother would believe such a claim and also was not sure that her grandmother would believe her, but said she probably would.  The victim also stated that she did not want her mother to be in trouble because of her stepdad.  The interview was concluded without any disclosure by the victim.

In November of 2008, the victim's aunt referred her to social worker Michelle Crowley of Trinity Community Support Services, because the victim was having behavioral problems at school and home. During a counseling session at the end of December, the victim disclosed that she had been sexually abused by her stepfather; specifically, she stated that he vaginally penetrated her. Crowley and the victim discussed Crowley's status as a mandated reporter, indicating that she would report the allegations. According to Crowley, the victim was relieved, but felt conflicted because she did not want to hurt her family. Crowley noted that after the disclosure, the victim had good and bad days and expressed self-hatred and a desire to harm herself. Crowley further noted that she had dealt with twenty to twenty-five prior sexual abuse cases and explained that it was not unusual for a victim to recant an allegation of sexual abuse. Crowley also stated that the victim did not trust anyone, had problems forming relationships, and had a habit of sabotaging existing ones. In Crowley's opinion, the abuse had a traumatic effect on the victim, caused her to feel anger toward her stepfather and caused feelings of hurt toward her mother because she did not protect her.

During cross-examination, Crowley stated that she believed the victim was being truthful. When asked the number of times the victim indicated that the defendant had sex with her, Crowley stated, "[t]o my recollection, about three to five times." Crowley also stated that the victim indicated oral sex with no emission and vaginal sex, but did not allege anal sex had occurred. Crowley confirmed that prior to the victim's disclosure, she denied any prior sexual or physical abuse during an initial checklist assessment completed at Trinity by another counselor. During redirect, Crowley confirmed that the victim used the word rape regarding the number of incidents, and not the word sex.

During the second C.A.C. interview with Rickles, which took place in 2009, the victim stated that she lied during the prior interview because her mother insisted she do so. According to the victim, her mother said she did not want the defendant to go to jail and stated that he would go to jail for the rest of his life because he has two other felony convictions for drug offenses. The victim stated that at the time of the second interview, she was living with her grandmother. The victim stated that the last incident of abuse occurred in March of 2008 (before the October 2008 interview). The victim stated that the defendant had sexual intercourse with her once in 2007. She could not remember the specific date, but stated that she told her mother after it happened. According to the victim, her mother yelled at the defendant and he left, and her mother told her not to bring it up again. After the victim told her aunt what happened, she was referred to Crowley. The victim stated that her aunt told her to follow her heart and not lie, so she decided to tell the truth. The victim stated that her mother still did not want her stepfather to go to jail adding, "[b]ut he needs to." The victim stated that although she lied for her mother during the last interview, this time she was telling the truth.

The victim stated that during the first incident, the defendant touched her and was looking at her breasts. She was ten years old at that time. She stated that the defendant touched her more than once starting when she was ten, indicating that

he would pull her shirt up or pull her pants down and touch her upper and lower body parts.  The victim also stated that on one occasion, her mother yelled at the defendant after she caught him on top of the victim sucking her breasts; still the abuse continued.  When the victim was about eleven years old, the defendant tried to make her "suck his thing."  The victim stated that on that occasion, sperm started coming out.  She stated that her mother did not do anything about the defendant's actions.  The defendant told the victim that she was disrespectful to her mother, that she wanted to be "hot" or "ho-ish," and that this was what boys would want to do with her if she kept acting that way.  The victim confirmed that the defendant's mouth touched her breasts only.

The victim further stated in the 2009 C.A.C. interview that the defendant had sexual intercourse with her during an incident that occurred after he attempted to make her perform oral sex.  The victim stated that the incident occurred in her bedroom while everyone else was sleeping (at night time).  She indicated that during intercourse, the defendant did not wear a condom and "stuff" did not come out.  She specified that "it," meaning the defendant's penis, was on the inside of her body.  The victim stated that she moved in with her grandmother when she was in the fifth grade, in 2007, because of the defendant's actions.  She stated that her mother knew why she left, and she indicated that she would live in the streets if she was not allowed to stay with her grandmother.

In April 2009, recorded telephone conversations between the victim and the defendant took place at Trinity.  During the first conversation, the victim told the defendant that she wanted to come home, but only if he promised not to do "it" again, and the defendant stated that he would not, adding "never, ever."  The victim attempted to make the defendant elaborate or specifically admit to what he did, and the defendant began to question her as to where she was calling from and why she was asking such questions.  The defendant told her he would call back.

When the defendant called back, he made several complaints about the victim's disclosures to individuals and stated that the victim was not even in Slidell the previous month.  The defendant stated that he was going to go to jail for the rest of his life based on her accusations and asked the victim why she did not indicate that she had been with a little boy instead of the defendant when her mother discovered a condom in the house.  In response, the victim stated that it was the defendant who had sex with her, and the defendant denied such actions, stating that he never "put [his] thing inside of [her]."  The victim again asked the defendant to admit what he did, and he told her not to tell anyone that because it would "f——up everybody."  When the victim said she did not want to lie, the defendant questioned the victim's whereabouts and told her to say she lied or made up the claims to get rid of the defendant.  The defendant told the victim he loved her and when the victim asked him why he did "it" in the first place, the defendant asked her to explain the quiet background and questioned her regarding the telephone she was using to communicate with him.  The defendant also told the victim that her mother was hurt and upset by the victim's claims, and that she needed to talk to her.  The defendant ultimately promised not to do it again if the victim said she lied about

the allegations. The victim subsequently specified that she did not want the defendant to do "that sex stuff" if she came back home. The defendant initially stated that he would not be there when she came back, and then added that there would be no "sex stuff" while he was around.

The victim was fifteen years old at the time of the trial. According to the victim, she was living with her biological father at the time. She testified that the defendant touched her "down here" with his fingers after removing her shorts and underwear when she was about nine years old. She stated that she did not like having to talk about the incidents in question and previously refused to talk about them or answer questions. Another incident occurred when the victim was ten years old, in her brother's bedroom in the middle of the night, and the defendant came in and took her pants off and starting "messing" with her. She specified that on that occasion the defendant "went in me from the back," specifying that he put his "stuff" or penis in her butt. When the victim was still ten years old, the defendant had sex with her on one occasion while she was in her own bedroom. He told her to take her pants off and when she refused, he hit her so she complied. When asked to clarify what body parts she was referencing, she stated, "his penis went in my vagina." The victim also described an incident of the defendant sucking her breasts with her bra pushed up. She testified that her mother became aware of the defendant's actions and walked in during an incident when the defendant was on top of her sucking her breasts. The defendant and her mother argued and the defendant left. The victim confirmed that she recalled seeing sperm coming out of the defendant's penis but could not remember during which incident. The victim testified that her friend told her to tell the school counselor about the incidents. The victim also stated that her mother and the defendant told her to recant her story after she disclosed the incidents to the school counselor.

During cross-examination, the victim stated that the defendant only had "sex" with her one time and added, "but he's been messing with me more than once." The victim did not tell her mother after the initial or even second or third incident, but did ultimately tell her. She denied that the defendant made her have oral sex with him, stating that he told her to, but she did not comply. She stated that the incidents would occur in the middle of the night or in the morning after the defendant took her mother to work. The victim admitted that she became angry when she did not receive a computer that she wanted for Christmas before she made the disclosures in question, but also specifically stated, "[t]hat's not why I told." The defense introduced a brief note that stated, "I love him [line 1] I miss him [line 2] hope to see him soon [line three]," followed by the victim's signature. The victim recalled giving the note to her mother to give to the defendant years before the trial, but after she made the complaints against the defendant. The victim admitted that she previously wanted to recant her story again because of the turmoil that took place after her disclosures. During redirect examination, the victim confirmed that she could not remember how far the defendant's penis went inside of her during intercourse and stated that she did not lie about the incidents in question to get out of her mother's home.

Dr. Adrienne Atzemis, an expert witness in the field of child-abuse pediatrics who evaluated the victim in February of 2009, stated the victim reported multiple incidents of abuse at that time. Dr. Atzemis explained that when children report multiple events, details of each event are specific to that event; however, when the incidents happen over multiple times, those details tend to be merged into one group. On that basis, it may seem as though a child is being inconsistent when they are talking about several events, but not providing self-exclusive details. Dr. Atzemis also discussed the concepts of partial and delayed disclosure and stated that children have different reasons for disclosing when they do and how they do, including naivety, internal reasons like feelings of guilt, responsibility, fear or embarrassment, and external reasons like threats or bribes. Dr. Atzemis stated that five years was the average length of delay for disclosure. Dr. Atzemis also stated that those types of pressures could also lead to recantations. Dr. Atzemis testified that the majority of recantations in sex abuse cases are false recantations in that the child takes it back even though their initial claim was actually true. The number of interviews and lack of family support were listed as risk factors leading to recantations.

Along with vaginal penetration by the defendant with his penis and finger, the victim reported that the defendant had put his mouth on her breasts, and she reported anal penetration. As with about ninety-five percent of children who are sexually assaulted, the victim's physical examination was normal; there was no injury or trauma to the hymen. Dr. Atzemis noted that the vagina and hymen are made up of the kind of tissue that heals extraordinarily well. Dr. Atzemis testified that the anus is even more simple than the vagina, noting that it is designed to pass bowel movements and thus, to stretch without injury. Dr. Atzemis also testified that child victims of sexual abuse do not usually hate the perpetrator. Instead, the perpetrator is usually someone they loved, were close to, and relied upon. During cross-examination, Dr. Atzemis confirmed there was no physical evidence of abuse and that most of the medical testimony consisted of generalizations. Dr. Atzemis also confirmed that the victim told her that she did not see anything come out of the defendant's penis and that the only oral contact disclosed by the victim was the defendant's mouth on her breasts.

During his trial testimony, the defendant testified that he met the victim's mother in 1998, when the victim was two years old. He stated that he raised the victim and loved her the same way that he loved his biological children and other stepchild. The defendant stated that a portion of their home was destroyed as a result of Hurricane Katrina and that the victim thereafter moved in with her grandparents. The defendant stated that he first learned about the allegations when his wife told him that a little girl said something happened to her, and the victim went along with it, although it did not happen to her. The defendant introduced work records including W-2s for 2005 through 2007, when he was working in Pascagoula, Mississippi. According to the defendant, he would sleep at a hotel and was not regularly at home in Slidell, Louisiana during that time period. The defendant stated that the entire family would be present when he was home, and he

responded negatively when asked during direct examination if he ever had intercourse (vaginal or anal) with the victim, "digitalized her vagina," or had oral sex with her. The defendant also denied sucking the victim's breast or ejaculating in front of her. The defendant testified that he was having a meeting in Florida at the time of the recorded telephone conversations with the victim and the telephone call surprised him. He stated that the conversation was rushed and that he only wanted to get back to his meeting and, therefore, told the victim what she wanted to hear. The defendant also stated that at the time, he wanted the victim to come home and have a family life again. The defendant testified that in 2008, the victim became upset after being disappointed because she did not receive the gift that she wanted for Christmas. He stated that he never hit the victim and that he had never been accused of sexual abuse outside of the victim's allegations.

During cross-examination, the defendant specified that during the periods of time that he worked in Pascagoula, he was working six days a week and travelled back to the family home on some Sundays. The defendant also confirmed that he reported $54,280 in wages for 2007, while he only reported $26,310 in wages for 2006, and $16,255 in 2005, which indicated he worked fewer days those years.

The victim's maternal grandfather, Pierre Fabre, testified that his home was always open to his grandchildren. When asked if the victim came to stay with him to get away from the defendant out of fear, Fabre stated that he was unaware of the reason or circumstances. He stated that he never noticed anything unusual about the defendant's relationship with the victim and did not have any reason to believe that he abused her. The victim's maternal grandmother, Kathy Fabre, testified that the victim was not living with her because of any abuse by the defendant and that the victim did not tell her about any abuse, but that she was helping her daughter raise her children. She stated that she would never advise the victim to recant or cover up any allegations. Further, she never suspected the defendant of abusing her granddaughter. The victim stayed with her grandparents until she was removed from their custody. The victim's maternal great aunt, Barbara LeFrere, testified that she and the victim were very close. She described the victim's relationship with the defendant as fun and loving. LeFrere did not believe the victim's allegations and stated that she felt as though the victim made up a lot of stories.

The victim's mother testified that the first time she heard any allegations of abuse was in October when she had to take the victim to the Hope House. She was informed at that time that her daughter took the claims back and that she made it up because of her friend L.M. She testified that she never saw the defendant have any inappropriate contact with the victim and did not suspect him of any such behavior. The victim's mother confirmed that she worked mornings and stated that the victim was not allowed to stay at home alone and that she was present when the victim was at home. She stated that sometimes the defendant would not come home for weeks at a time when he was working in Mississippi, but confirmed that he came home on the weekends if he was off on a Friday and Saturday.

Aggravated rape is a general intent crime. State v. McDaniel, 515 So.2d 572, 575 (La.App. 1st Cir. 1987), writ denied, 533 So.2d 10 (La. 1988). "General

criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."  La. R.S. 14:10(2).  The trier of fact is to determine the requisite intent in a criminal case.  State v. Crawford, 619 So.2d 828, 831 (La.App. 1st Cir.), writ denied, 625 So.2d 1032 (La. 1993).

An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact.  The trier of fact may accept or reject, in whole or in part, the testimony of any witness.  The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient.  State v. Azema, 633 So.2d 723, 727 (La.App. 1st Cir.1993), writ denied, 94-0141 (La. 4/29/94), 637 So.2d 460; State v. Quinn, 479 So.2d 592, 596 (La.App. 1st Cir. 1985).  The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense.  State v. James, 02-2079, p. 8 (La.App. 1st Cir. 5/9/03), 849 So.2d 574, 581.

In State v. Chauvin, 02-1188, p. 8 (La. 5/20/03), 846 So.2d 697, 702, the Louisiana Supreme Court stated the following regarding child sexual abuse cases:

> We begin by noting that child sexual abuse cases are not easy to prosecute.  Child sexual abuse is difficult to prove because it most often occurs in private, often the perpetrator is a member of the victim's family, and physical evidence of the abuse is rare.  The problems with prosecuting child sexual abuse cases are increased by the fact that most children fail to report the abuse, and, if they do report, there is often a significant lapse in time between the actual occurrence and the ultimate reporting of the abusive incident by the child.  Even then, the child may not include details in her revelation and often children recant or alter their allegations of abuse. [Citations omitted.]

Any penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient sexual penetration.  See State v. Ross, 03-0564, p. 11 (La.App. 3d Cir.12/17/03), 861 So.2d 888, 895, writ denied, 04-0376 (La.6/25/04), 876 So.2d 829.  While in the instant case there was no physical evidence to prove the rape had occurred, it is not necessary that there be physical evidence to prove the defendant committed aggravated rape.  The victim's trial testimony and prior disclosures were consistent with the defendant having penetrated the victim vaginally and anally when she was under the age of thirteen years.  After a thorough review of the record, viewing the evidence in the light most favorable to the State, we are convinced that a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of

innocence, that the defendant was guilty of the aggravated rape of the victim.  See State v. Calloway, 07-2306, p. 2 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).  The first pro se assignment of error is without merit.[17]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[18]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  He has not done so.

As the Louisiana First Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 561 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state

---

[17] State v. Johnson, No. 2011 KA 2240, 2012 WL 2061678, at *4-12 (La. 1st Cir. June 8, 2012); State Rec., Vol. 5 of 9.

[18] State v. Johnson, 105 So.3d 711 (La. 2013); State Rec., Vol. 6 of 9.

court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").  Moreover, because the state court's decision applying the already deferential <u>Jackson</u> standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2152 (2012); <u>see also</u> <u>Coleman v. Johnson</u>, 132 S. Ct. 2060, 2062 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the <u>Jackson</u> standard need be satisfied, even if state law would impose a more demanding standard of proof.  <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 Fed. App'x 405 (5th Cir. 2011); <u>Williams v. Cain</u>, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), <u>aff'd</u>, 408 Fed. App'x 817 (5th Cir. 2011); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); <u>Wade v. Cain</u>, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), <u>aff'd</u>, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); <u>see also</u> <u>Coleman</u>, 132 S. Ct. at 2064 ("Under <u>Jackson</u>, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

In the instant case, the elements of the crime and petitioner's guilt was established through the victim's testimony, and it is clear that *a victim's testimony alone is generally sufficient evidence to support a conviction.* Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 9430310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); Holderfield v. Jones, 903 F. Supp. 1011, 1017 (E.D. La. 1995). Although petitioner claims that the victim lied, the jury obviously found her testimony credible. Where, as here, a petitioner's insufficient evidence claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## Suppression Claim

Petitioner's third claim is that the trial court erred when it denied the defense motion to suppress the recordings of telephone calls between petitioner and the victim.  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

[T]he defendant contends that the trial court erred in denying his motion to suppress evidence of the introduction of a partially inaudible recording of telephone calls. The defendant contends that the admission of the telephone calls violated state and federal law, as the telephone calls were between the states of Louisiana and Florida, and the defendant did not consent to the recordings.  The defendant further contends that the victim was not old enough to consent to the recordings without parental or guardian permission.  The defendant also contends that the State failed to call the detective who recorded the communications as a witness to lay the foundation for the introduction of the recorded conversations and failed to produce a warrant for the recordings.  The defendant notes that Darlene Carter testified that she transcribed the taped conversations, though she was not a certified transcriptionist and was not present during the conversations between the defendant and the victim. The defendant contends that neither the State nor the detective had authorization for the interception or recording of these conversations and that in accordance with La. R.S. 15:1307, the recording was inadmissible as evidence of the defendant's guilt.  The defendant also contends that the State misconstrued the conversations between him and the victim to suggest that the defendant admitted guilt, although he was simply trying to hurry the conversation along so as to not be rude to the victim.

Louisiana's Electronic Surveillance Act was fashioned after its federal counterpart, 18 U.S.C. § 2510 *et seq.*, Title III of the Omnibus Crime Control and Safe Streets Act (the federal counterpart to the Louisiana Electronic Surveillance Act is contained in Title III of the federal Omnibus Crime Control & Safe Street Act, which deals with more comprehensive issues than electronic surveillance issues only).  The Electronic Surveillance Act, La. R.S. 15:1301, *et seq.*, generally prohibits the interception and disclosure of wire or oral communications.  However, there are exceptions to this general prohibition, such as where one of the parties to the communication consents to its interception.  See La. R.S. 15:1303(C)(3) & (4); see also 18 U.S.C.A. § 2511(2)(c) & (d); State v. Vince, 98-1892, p. 4 (La.App. 1st Cir. 6/25/99), 739 So.2d 308, 310, writ denied, 99-2232 (La. 1/28/00), 753 So.2d 230.

Herein, at the motion to suppress hearing, the defendant noted that the victim instituted a telephone conversation as an agent for the sheriff's office.  The defendant further noted that, without his knowledge, the conversation was recorded and edited, and questions were prompted by the sheriff's office.  The defendant argued that this constituted a violation of his privacy and Miranda[FN2] rights and

Title 15. The defendant further noted that when he called the victim back, the police listened in on the second conversation, recorded it, and again prompted the questions. The State acknowledged that the conversations were recorded with the victim's consent and that members of the sheriff's office were present, but denied that questions were being prompted and argued that such prompting would not be gravamen as to the admissibility of the evidence. The State further noted that the defendant was not in police custody at the time of the conversations. The trial court listened to the recorded conversations and ruled the evidence admissible, noting that the noncustodial statements did not require <u>Miranda</u> warnings and that such incriminating statements are not considered hearsay.

    [FN2]  <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In the instant case, there is no doubt that telephone conversations between the defendant and the victim were recorded and intended for use at trial by the authorities and admitted as evidence during the trial. When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, *i.e.*, unless such ruling is not supported by the evidence. <u>See</u> <u>State v. Green</u>, 94-0887, p. 11 (La. 5/22/95), 655 So.2d 272, 281. However, a trial court's legal findings are subject to a *de novo* standard of review. <u>See</u> <u>State v. Hunt</u>, 09-1589, p. 6 (La. 12/1/09), 25 So.3d 746, 751. Herein, the victim consented to the recordings. Although Louisiana law generally prohibits the interception of wire or oral communication, an exception is made where the interceptor is a party to the communication or one of the parties to the communication has given prior consent to such interception. La. R.S. 15:1303(C). The calls at issue were recorded by the victim or with her consent and she was a party to the conversations.

While the defendant now argues on appeal that the victim was too young to consent to the recordings or that two-party consent is required in the state of Florida,[FN3] he did not raise these arguments below. It is well settled that a new basis or ground for the motion to suppress cannot be articulated for the first time on appeal. <u>State v. Brown</u>, 434 So.2d 399, 402 (La. 1983). This is prohibited under the provisions of La. C. Cr. P. arts. 703(F) and 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. <u>See also</u> <u>State v. Peters</u>, 546 So.2d 829, 831 (La.App. 1st Cir.), <u>writ denied</u>, 552 So.2d 378 (La. 1989). We conclude that the trial court did not err or abuse its discretion in allowing the recordings into evidence. This assignment of error lacks merit.

> [FN3]  The defendant does not reference any statutory or jurisprudential authority for his assertion that Florida requires two-party consent.[19]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[20]

To the extent that petitioner is arguing that the state courts misapplied state evidence law in finding the recordings admissible, his claim simply is not reviewable in this federal proceeding. As the United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Additionally, to the extent that he arguing that he is entitled to habeas corpus relief on the basis that the law enforcement officials allegedly violated state and/or federal law in recording the conversations, he is incorrect for the following reasons.

For example, to the extent that petitioner is arguing that the evidence was secured and introduced at trial in violation of the Louisiana's Electronic Surveillance Act, that argument is misplaced.  In rejecting a similar claim, United States Magistrate Judge Alma Chasez explained in an opinion subsequently adopted by United States District Judge Nanette Jolivette Brown:

> Although [petitioner] argues that the [law enforcement authorities] obtained the recordings in violation of Louisiana law and that the state court admitted the recordings in violation of a Louisiana statute, these matters are not cognizable on habeas review because they are matters of state law.  This court does not sit to review the state court's interpretation and application of its own laws.  See Swarthout v. Cooke, —— U.S. ——, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (federal habeas review does not lie for errors of state law); Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992).  Moreover, the Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v.

---

[19] State v. Johnson, No. 2011 KA 2240, 2012 WL 2061678, at *12-13 (La. 1st Cir. June 8, 2012); State Rec., Vol. 5 of 9.

[20] State v. Johnson, 105 So.3d 711 (La. 2013); State Rec., Vol. 6 of 9.

Richey, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (*citing* Estelle, 502 U.S. at 67-68; Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)).  Therefore, to the extent that [petitioner] is arguing that the state courts merely misapplied state law with respect to this claim, his claim is not reviewable in this federal proceeding.

Favors v. Cain, Civ. Action No. 13-491, 2015 WL 349263, at *28 (E.D. La. Jan. 22, 2015); accord

Green v. Cain, Civ. Action No. 14-2073, 2016 WL 6477038, at *4 (E.D. La. May 13, 2016) (Knowles, M.J.) (finding that petitioner's claim that the Louisiana Electronic Surveillance Act precluded admission of evidence was not cognizable on habeas review because the claim was "purely one of state law"), adopted, 2016 WL 6441232 (Nov. 11, 2016) (Milazzo, J.).

To the extent that petitioner is arguing that the interception of the communications also violated the laws of the state of Florida, the result is the same – again, violations of state law (regardless of the state in question) simply are not cognizable on federal habeas corpus review.  28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State *court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*." (emphasis added)); Engle v. Isaac, 456 U.S. 107, 119 (1983).

Lastly, to the extent that petitioner is arguing that interception of the communications violated *federal* law, his claim fares no better for the following reasons.

If he is arguing that the actions of the officers ran afoul of the United States Constitution, his claim would fall under the Fourth Amendment.  See Green, 2016 WL 6477038, at *3-4; Favors, 2015 WL 349263, at *29.  However, as the state correctly notes in its response, this Court is barred from reviewing any such Fourth Amendment claim by Stone v. Powell, 428 U.S. 465 (1976).

In <u>Stone</u>, the United States Supreme Court held that where a state provides an opportunity for full and fair litigation of Fourth Amendment claims in the state courts, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence against him was obtained in violation of the Fourth Amendment. <u>Id</u>. at 494 (footnote omitted); <u>see also</u> <u>Janecka v. Cockrell</u>, 301 F.3d 316, 320 (5th Cir. 2002). Interpreting <u>Stone</u>, the United States Fifth Circuit Court of Appeals has held:

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, <u>Stone v. Powell</u> bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

<u>Caver v. Alabama</u>, 577 F.2d 1188, 1192 (5th Cir. 1978). The <u>Stone</u> bar applies even if the state court ruling on the Fourth Amendment claim was erroneous. <u>Swicegood v. Alabama</u>, 577 F.2d 1322, 1324 (5th Cir. 1978).

<u>Stone</u> clearly applies here, in that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims." <u>Bailey v. Cain</u>, Civil Action No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007). As a result, <u>Stone</u> prohibits this Court from reviewing petitioner's Fourth Amendment claim.

On the other hand, if petitioner is contending that the officers' actions violated federal *statutory* laws regarding the interception of communications, his claim still fails. In denying such a claim in <u>Hussong v. Warden, Wisconsin State Reformatory</u>, 623 F.2d 1185 (7th Cir. 1980), the United States Seventh Circuit Court of Appeal explained:

> [T]he federal habeas statute, 28 U.S.C. § 2254, does not provide a remedy for this nonconstitutional federal claim. On its face the habeas statute offers relief to all state prisoners who are in custody "in violation of the Constitution *or laws* or treaties of the United States" (emphasis added), but the statute has never been interpreted to encompass every nonconstitutional federal claim. In <u>Hill v. United</u>

28

States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Supreme Court defined the scope of habeas relief for nonconstitutional violations of federal law when it rejected a habeas petition alleging a violation of Rule 32(a) of the Federal Rules of Criminal Procedure:

> It is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure. It does not present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent."

368 U.S. at 428, 82 S.Ct. at 471 (citations omitted).

The Hill standard was applied again in Davis v. United States, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), when the Court set aside the defendant's conviction for an act which was no longer criminal because of a change in the law:

> There can be no room for doubt that such a circumstance "inherently results in a complete miscarriage of justice" and "present(s) exceptional circumstances" that justify collateral relief ….

417 U.S. at 346-47, 94 S.Ct. at 2305.

Only last year the Supreme Court held that a violation of Rule 11 was not cognizable on federal habeas corpus because it was not jurisdictional or constitutional and could not result in a "'complete miscarriage of justice' or in a proceeding 'inconsistent with the rudimentary demands of fair procedure.'" United States v. Timreck, 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979) (citations omitted).

Turning to the case at bar, we note that a violation of the federal wiretap statute is neither constitutional nor jurisdictional. Because it has been conceded for purposes of this appeal that Hussong received a full and fair hearing in the state courts on his suppression claim, we do not find that Hussong's custody is "'inconsistent with the rudimentary demands of fair procedure.'" United States v. Timreck, 441 U.S. at 784, 99 S.Ct. at 2087 (citations omitted). If Hussong's petition states a violation of nonconstitutional federal law which is cognizable on habeas, it must be because Hussong's custody is "a complete miscarriage of justice" warranting exceptional relief. United States v. Timreck, supra. We conclude that even if Hussong was convicted on the basis of evidence admitted in violation of the wiretap statute, his custody does not constitute "a complete miscarriage of justice."

623 F.2d at 1190-91 (footnotes omitted). Accord Lord v. Lambert, 347 F.3d 1091, 1094-95 (9th Cir. 2003); Llamas-Almaguer v. Wainwright, 666 F.2d 191, 193-94 (5th Cir. 1982).

Here, petitioner was provided a full and fair opportunity to litigate his claim in state courts, including on appeal. Therefore, even if the intercepted communications should have been excluded, their admission did not deprive him of his due process rights or result in a complete miscarriage of justice.

For all of these reasons, petitioner has not established that his claim is cognizable on federal habeas corpus review or that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this claim should be denied.

### **Batson Claim**

Petitioner's fourth claim is that his rights were violated when the state used race as the basis for striking two African American jurors from the panel. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant contends that the trial court erred in allowing the State to strike two African American prospective jurors (Sidney Harris and Wali Haqq) in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The defendant contends that the defense counsel made a prima facie showing that the two peremptory strikes used by the State were targeted at specifically removing the only two African American prospective jurors from the jury. The defendant concludes that the trial court denied him his constitutional and statutorily protected rights in allowing the State to dismiss the two African American prospective jurors.
>
> The Equal Protection Clause prohibits the prosecution and the defense from using peremptory challenges to exclude otherwise qualified and unbiased persons from a petit jury solely for reasons of their race. <u>See</u> <u>Batson</u>, 476 U.S. at 84-85, 106 S.Ct. at 1716; <u>see also</u> La. C. Cr. P. art. 795(C). In <u>Batson</u>, the Supreme Court adopted a three-step analysis to determine whether or not the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful

discrimination.  See Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723-24.  Hernandez v. New York, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

A prima facie case of race-based exclusion should present evidence to show that the pertinent circumstances raise an inference that the prosecutor used peremptory challenges to exclude venire members of a cognizable racial group solely on the basis of race.  State v. Collier, 553 So.2d 815, 818 (La. 1989).  The trial court should determine whether the defendant has established the requisite prima facie case of discriminatory selection.  Collier, 553 So.2d at 819.  As the first step in this process, it places a burden of production or of "going forward" on the defendant.  If the defendant is unable to make a prima facie case of racial discrimination, then the Batson challenge fails and it is not necessary for the prosecutor to articulate race-neutral explanations for his strikes.  Thus, the combination of factors needed to establish a prima facie case are:  (1) the defendant must demonstrate that the prosecutor's challenge was directed at a member of a cognizable group; (2) the defendant must then show that the challenge was peremptory rather than for cause (i.e., "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'"); and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the venireperson on account of race.  Batson, 476 U.S. at 96, 106 S.Ct. at 1723; see also State v. Myers, 99-1803, p. 4 (La. 4/11/00), 761 So.2d 498, 501.

The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy his initial burden.  Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class that is alleged to be the victim of purposeful discrimination.  Green, 94-0887 at p. 24, 655 So.2d at 288.  Disparate impact on a suspect class, while deserving of some weight in the determination of whether purposeful discrimination exists, is not a dispositive fact, since "[a]n argument relating to the impact of a classification does not alone show its purpose."  Hernandez, 500 U.S. at 362, 111 S.Ct. at 1867.

For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, the result "must ultimately be traced to a racially discriminatory purpose."  Batson, 476 U.S. at 93, 106 S.Ct. at 1721 (quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976)).  Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes.  Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.  Green, 94-0887 at pp. 24-25, 655 So.2d at 287-88.

Sidney Harris, a reserve deputy for Orleans Parish Sheriff's Office, was a prospective juror on the first panel of the voir dire herein.  During questioning, Harris confirmed that he could give the defendant a fair trial, could find someone guilty without medical evidence, and that he had no problem with the fact that the alleged offense carried a mandatory sentence of life imprisonment upon conviction.  However, Harris also stated that he would be affected if the non-accused parent sides with the accused parent instead of the victim.  Harris specifically stated that in such a case, the non-accused parent may be aware of the child's propensity to make up stories or tell lies.  When asked to provide an alternative reason for the parent supporting the accused as opposed to the alleged victim, Harris stated, "[j]ust being stupid."  Also, when asked to give a percentage of sexual abuse allegations that are false in general, while many prospective jurors said only a few cases of false allegations are brought, Harris stated, "I'm going to say half."  Further, when asked if he could base a conviction solely on a child's statement, Harris stated, "With the right evidence.  I can't – that just seems – if the evidence shows it.  But if the child says yeah, I can't.  I can't.  I wouldn't be able to."

After the State indicated its desire to use a peremptory challenge to remove Harris, the defense objected and asked for a reason.  The defense noted that Harris was one of a total of two African American prospective jurors on the first panel and the other had been removed for cause.  The trial court stated that it would allow the State to give a reason, but noted that it was difficult to establish a pattern based on the challenge of one juror.  The State provided the following reason for the peremptory strike:  "Mr. Harris looked me in the eye when I asked him if he could convict based upon the testimony of one witness, and he said:  'I can't.'  I then asked the question several different ways, and he has convinced me that he can't." The trial court accepted the State's reason over the defense objection.

Wali Haqq, a Folgers Coffee Company employee, was a prospective juror on the second panel.  Haqq responded positively when asked if he had been a victim of a crime, noting that he was robbed in New Orleans and responded negatively when asked if he knew if anyone was arrested for the offense.  Haqq also indicated that he had two friends in the New Orleans Police Department.

When the State inquired as to whether the jurors could convict if they believed the child although there is no medical test to confirm her statements, Haqq stated, "I would need some evidence."  Based on that response, the State further questioned Haqq, asking him if he would consider voting not guilty if there was no medical evidence to support the child's statement and Haqq stated, "I believe so. I think I would need some other evidence."  Upon further questioning, Haqq reiterated, "I would still think I would need something besides a child's word." Although several jurors stated that they could convict if they believed the alleged victim, even in the absence of medical evidence, Haqq adamantly confirmed his stance upon further questioning.  When asked if the penalty of life imprisonment presented a problem, Haqq responded positively, confirming that the possible penalty would cause him to require a heightened burden of proof or level of certainty.

Haqq further indicated that he believed most sexual abuse victims would either wait until they were adults to disclose the abuse or never disclose it at all even if asked. However when asked for an estimate of how many sexual abuse allegations in general were falsified, he indicated that only a few were false. When subsequently asked if he could base a conviction entirely on the credibility of one child, Haqq stated that his position remained the same. Upon further questioning by the trial court regarding his ability to find the defendant guilty based upon the testimony of one witness if the witness is convincing beyond a reasonable doubt, Haqq stated, "I would have a hard time with the sentence that's been imposed to convict." Upon further questioning, Haqq ultimately stated, "[i]t would have to be very credible." He then agreed that he would probably find the defendant guilty if the burden of proof was met.

The trial court denied the State's attempt to remove Haqq for cause. The defense objected when the State attempted to use a peremptory strike to excuse Haqq. The defense noted that this would be the second strike of two prospective African American jurors, establishing a pattern of strikes being used based only on race. The trial court noted that it recalled Haqq's responses but allowed the State to give its reason for the strike. The State noted that Haqq made it unmistakable that he would not convict based on the statement of one witness and that the penalty would prevent him from convicting. The trial court stated that while it would not grant the challenge for cause, it would have the same concerns as the State based on Haqq's responses.

We note that the State also challenged prospective jurors Scott Harding and Nancy Blackburn based on similar responses as Wali Haqq's regarding their inability to render a guilty verdict without medical evidence. Those challenges are not being contested on appeal, presumably because those prospective jurors were not African American. Although the State's exercise of two peremptory challenges against two African American prospective jurors may have had a disparate impact on the final composition of the jury, disparate impact on a suspect class is not a dispositive fact, and there is no evidence of purposeful discrimination.

We find that the State sustained its burden of articulating "race-neutral" reasons for the exercise of the peremptory strikes at issue. Further, based upon our review of the voir dire transcript, we find that the statements or actions by the prosecutor do not support an inference that the exercise of the peremptory strikes was motivated by impermissible considerations. As provided in Batson, a prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. A consideration of the totality of the responses provided by the prospective jurors at issue herein would refute an inference of discriminatory purpose. We find that the trial court did not abuse its

> discretion in overruling the defendant's <u>Batson</u> objections.  The final pro se
> assignment of error lacks merit.[21]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[22]

As the state court noted, petitioner's claim must be analyzed under the three-step process

established in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  Specifically:

> First, a defendant must make a prima facie showing that a peremptory challenge
> has been exercised on the basis of race; second, if that showing has been made, the
> prosecution must offer a race-neutral basis for striking the juror in question; and
> third, in light of the parties' submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.

<u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-77 (2008) (quotation marks and brackets omitted).

However:

> Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory
> strikes, the question of Defendant's prima facie case is rendered moot and our
> review is limited to the second and third steps of the <u>Batson</u> analysis.  <u>See</u> <u>United</u>
> <u>States v. Broussard</u>, 987 F.2d 215, 220 n. 4 (5th Cir.1993) (declining to decide
> whether defendant had established prima facie case of racial discrimination, where
> district court required explanation for peremptory strikes).

<u>United States v. Williams</u>, 264 F.3d 561, 571 (5th Cir. 2001).

At the second step, the burden shifts to the striking party to articulate a race neutral

explanation for striking the jurors in question.  <u>Snyder</u>, 552 U.S. at 476.  However, "the

prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."

<u>Batson</u>, 476 U.S. at 97.  On the contrary, "[a] neutral explanation in the context of our analysis

here means an explanation based on something other than the race of the juror.  At this step of the

inquiry, the issue is the *facial validity* of the prosecutor's explanation.  Unless a discriminatory

---

[21] <u>State v. Johnson</u>, No. 2011 KA 2240, 2012 WL 2061678, at *14-17 (La. 1st Cir. June 8, 2012); State Rec., Vol. 5 of 9.
[22] <u>State v. Johnson</u>, 105 So.3d 711 (La. 2013); State Rec., Vol. 6 of 9.

intent is *inherent* in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360 (1995) (emphasis added).  As noted in the state court opinion, the state's articulated reasons for the exercise of its strikes were that (1) Harris repeatedly indicated he was unable to vote to convict a defendant based upon the testimony of a single witness and (2) Haqq likewise indicated an unwillingness to convict based upon the testimony of a single witness and further indicated that, in such a case, he would be prevented from finding a defendant guilty of aggravated rape due to the severity of the sentence which would be imposed.  Those stated reasons obviously are in no way inherently indicative of an intent to discriminate based on race, and, therefore, they satisfied the state's minimal burden at the second stage.

Thus, the Court's inquiry proceeds to the third step and the ultimate question of whether intentional discrimination in fact motivated the state's peremptory strikes.  "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  Rice v. Collins, 546 U.S. 333, 338 (2006).

The United States Supreme Court has held that the state court's finding on Batson's third step is a finding of *fact* and, as such, must be reviewed under the AEDPA's specific and highly deferential standard of review applicable to factual determinations.  Therefore:

> Under AEDPA, … a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Thus, a federal habeas court can only grant [the petitioner's] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge.  State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1).

Rice, 546 U.S. at 338-39 (2006); accord Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016) (Batson's third step "turns on factual determinations, and, in the absence of exceptional circumstances, we defer to state court factual findings unless we conclude that they are clearly erroneous." (quotation marks omitted); Murphy v. Dretke, 416 F.3d 427, 432 (5th Cir. 2005) ("A state trial court's finding of the absence of discriminatory intent is a pure issue of fact that is accorded great deference and will not be overturned unless clearly erroneous." (quotation marks omitted)). Therefore, even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, … on habeas review that does not suffice to supersede the trial court's credibility determination." Rice, 546 U.S. at 341-42; accord Wood v. Allen, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

Here, petitioner has failed to point to clear and convincing showing that state court clearly erred in finding that the prosecution's peremptory strikes were not motivated by an intent to discriminate. Accordingly, the AEDPA's deferential standard of review requires this Court to defer to the state court decision and to deny this claim.

## Claim Concerning Denial of Motion for New Trial

Petitioner's fifth claim is that the trial court abused its discretion in denying the defense motion for a new trial. This claim, which was asserted and denied on the merits in the state post-conviction proceedings, cannot serve as a basis for federal relief. Simply put, a denial of a motion for new trial does not violate an independent, cognizable federal constitutional right. See Haygood v. Quarterman, 239 Fed. App'x 39, 42 (5th Cir. 2007) ("[W]e have held that the denial of a motion for new trial does not necessarily constitute a violation of a federal constitutional right.");

Krodinger v. Kent, Civ. Action No. 16-2069, 2016 WL 7191684, at *14 (E.D. La. Sept. 30, 2016) ("To the extent [petitioner] claims that the state trial court improperly denied his motion for post-verdict judgment of acquittal, that claim does not warrant federal habeas corpus relief.  A state court's denial of that type of post-trial motion does not violate a federal constitutional right."), adopted, 2016 WL 7187948 (E.D. La. Dec. 12, 2016); Colbert v. Cain, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016) ("[T]o the extent petitioner is also arguing that his post-trial motions were erroneously denied, a denial of such motions does not violate an independent, cognizable federal constitutional right."), adopted, 2016 WL 4161257 (E.D. La. Aug. 5, 2016).  Therefore, this claim should be denied.

## Claim Challenging the Validity of Non-unanimous Verdict

Petitioner's sixth claim is that his rights were violated because he was convicted by a non-unanimous jury verdict, in that only eleven of the twelve jurors joined in the verdict.  That claim, which likewise was asserted and denied on the merits in the state post-conviction proceeding, is clearly meritless.  In Apodaca v. Oregon, 406 U.S. 404 (1972), and Johnson v. Louisiana, 406 U.S. 356 (1972), the Supreme Court upheld the constitutionality of state laws, including that in Louisiana, which permitted criminal defendants to be convicted by less than unanimous votes of the jury.  The Supreme Court has made clear that, "although the Sixth Amendment right to trial by jury requires a unanimous verdict in federal criminal trials, it does not require a unanimous verdict in state criminal trials."  McDonald v. City of Chicago, 561 U.S. 742, 765 n.14 (2010); Hoover v. Johnson, 193 F.3d 366, 369 (5th Cir. 1999) ("[W]e cannot find, as petitioner would like, that the state court violated any federal right to a unanimous verdict in state court, because the Supreme

Court has not held that the Constitution imposes a jury unanimity requirement." (quotation marks omitted)).  Therefore, this claim should also be denied.

### Expert Witness Testimony Claim

Petitioner's seventh and final claim is that the trial court abused its discretion when it accepted the expert testimony of Dr. Adrienne Atzemis.  That claim was asserted and denied on the merits in the state post-conviction proceedings.

In its response, the state argues that petitioner's claim seems to be merely asserting that the trial court's ruling allowing the testimony ran afoul of state evidentiary law.  If so, as already explained earlier in this opinion, '[i]n habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, such a state law claim simply would not be cognizable.

However, in both his federal application and his reply to the state's response, petitioner seems to suggest that his claim is also grounded in federal law, specifically Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  However, that does not aid him.

As an initial matter, the undersigned notes that "Daubert is not premised on the [federal] Constitution."  Black v. Thomas, No. 1:04-cv-567, 2006 WL 2547405, at *7 (M.D. Ala. Aug. 31, 2006); accord Golden v. Cooley, Civ. Action No. 15-1644, 2016 WL 6426408, at *8 (E.D. La. Sept. 6, 2016), adopted, 2016 WL 6403280 (E.D. La. Oct. 28, 2016); Williams v. Withrow, 328 F. Supp. 2d 735, 745 (E.D. Mich. 2004).  Rather, it has been noted:

> Daubert is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only.  Daubert does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution.

Kinder v. Bowersox, 272 F.3d 532, 545 n.9 (8th Cir. 2001); accord Norris v. Schotten, 146 F.3d 314, 335 (6th Cir. 1998).  Accordingly, Daubert has no direct applicability to federal habeas corpus claims and cannot serve as a basis for the granting of habeas relief.  See Brown v. Watters, 599 F.3d 602, 616 (7th Cir. 2010); Keller v. Larkins, 251 F.3d 408, 419 (3rd Cir. 2001); Golden, 2016 WL 6426408, at *8; Craig v. Cain, Civ. Action No. 08-3486, 2009 WL 117010, at *9 (E.D. La. Jan. 14, 2009); Stogner v. Cain, Civ. Action No. 05-4317, 2008 WL 269078, at *13 (E.D. La. Jan. 30, 2008); Payne v. Bobby, No. 2:05-CV-050, 2006 WL 508784, at *23 (S.D. Ohio Feb. 27, 2006), adopted, 2006 WL 2583380 (S.D. Ohio Sept. 6, 2006); Hassinger v. Adams, No. C 05-01011, 2006 WL 294798, at *13 n.6 (N.D. Cal. Feb. 7, 2006).

This Court is, of course, aware that the Louisiana Supreme Court has found Daubert persuasive and, *as a matter of state law*, has similarly adopted a "requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." State v. Foret, 628 So.2d 1116, 1123 (La. 1993).  The Louisiana Supreme Court continued: "As we find the Daubert court's 'observations' on what will help to determine this threshold level of reliability to be an effective guide, we shall adopt these 'observations', as well." Id. Nevertheless, although Foret dictates that Louisiana courts use the Daubert considerations as a guide in determining admissibility of scientific evidence, those courts are ultimately deciding whether the evidence in a particular case is admissible under article 702 of the *Louisiana* Code of Evidence.  Bella v. Cain, Civ. Action No. 12-2323, 2015 WL 1311216, at *7 (E.D. La. Mar. 23, 2015).  As a result, state court's decision on such a matter concerns an issue of *state* law and, for the reasons already explained, therefore would not be reviewable in a federal habeas corpus proceeding.  See Golden, 2016 WL 6426408, at *8; Bella, 2015 WL 1311216, at *7; cf. Britz v.

Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999) ("[A] state cannot expand federal jurisdiction by deciding to copy a federal law.  If it incorporates federal law into state law and then gets the federal law wrong, it has made a mistake of state law, which cannot be a basis for federal habeas corpus." (citation omitted)).

Rather, as already explained, "a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, habeas relief is warranted only where the evidentiary error "played a crucial, critical, and highly significant role in the trial." Id.; accord Wilson v. Simmons, 536 F.3d 1064, 1101-02 (10th Cir. 2008) ("Because Daubert does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the [Polymerase Chain Reaction] test rendered the trial fundamentally unfair."); Schmidt v. Hubert, Civ. Action No. 05-2168, 2008 WL 4491467, at *14 (W.D. La. Oct. 6, 2008) ("The standard, then, is not whether the testimony satisfied the Daubert test, which does not set forth a constitutional rule on the admissibility of scientific evidence, but rather whether the wrongful admission of evidence rendered the trial fundamentally unfair.  A trial is fundamentally unfair only if the evidence played a 'crucial, critical, and highly significant role in the trial....'" (citations omitted)); Stogner, 2008 WL 269078, at *13.

Here, defense counsel stipulated that Dr. Atzemis was qualified to testify as an expert witness[23] and, during her testimony, lodged few objections, none of which were of consequence. Further, the Court has reviewed Dr. Atzemis's testimony in its entirety and finds that it was routine

---

[23] State Rec., Vol. 3 of 9, trial transcript, pp. 513-14.

and appropriate.   There is simply no basis for concluding that her testimony rendered petitioner's

trial unfair.  Accordingly, this claim should be denied.

### <u>RECOMMENDATION</u>

It is therefore **RECOMMENDED** that Trevor Johnson's federal application seeking

habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14) days

after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-fifth day of April, 2017.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**